REVISED - June 28, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-50367

VICTORIA RIZZO,

Plaintiff-Appellee,

VERSUS

CHILDREN'S WORLD LEARNING CENTERS, INC.,

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Texas

May 26, 2000

Before KING, Chief Judge, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER and DENNIS, Circuit Judges.

DAVIS, Circuit Judge.

We took this case en banc primarily to determine whether, in this fully-tried case, the district court erred in the instructions it gave to the jury in Victoria Rizzo's action under the Americans with Disabilities Act and, secondarily, whether the record supports the verdict. The jury, in response to special interrogatories, rendered a verdict in favor of Ms. Rizzo. After carefully

reviewing the record, we conclude that the district court committed no plain error in submitting this case to the jury and that the evidence amply supports the verdict. We therefore affirm the judgment of the district court.

## I.

Appellee, Ms. Victoria Rizzo, was employed by appellant, Children's World Learning Centers, Inc. (CWLC), as a teacher's aid. One of her duties was driving a van transporting children to and from school. Ms. Rizzo had a hearing impairment which she disclosed to CWLC before she was hired. After observing Ms. Rizzo in the classroom, a parent expressed concern about whether Ms. Rizzo's hearing impairment placed the children at risk while they were riding as passengers in Ms. Rizzo's van. Shortly thereafter, CWLC relieved Ms. Rizzo of her driving duties because of their concern that her hearing impairment prevented her from safely driving the van and supervising the children in the van.

The district court initially granted summary judgment in favor of CWLC on grounds that the employer took the personnel action for a legitimate non-discriminatory reason and Rizzo failed to show that this reason was pretextual. Ms. Rizzo appealed to this court and we concluded that issues of fact were presented that required resolution at trial. Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758 (5th Cir. 1996)(Rizzo I). We stated that "[w]hether one is a direct threat [to the safety of herself or

2

others] is a complicated, fact intensive determination, not a question of law.  To determine whether a particular individual performing a particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all of the evidence about the nature of the risk and the potential harm." Id. at 764.  On the burden of proof, we stated that "[a]n employee who is a direct threat is not a qualified individual with a disability. As with all affirmative defenses, the employer bears the burden of proving that the employee is a direct threat."  Id.

On remand, the case was tried to a jury, which rendered a verdict in favor of Ms. Rizzo.  The district court entered a judgment on the verdict and a divided panel affirmed.  Rizzo v. Children's World Learning Centers, Inc., 173 F.3d 254 (5th Cir. 1999)(Rizzo II).  The dissent took the position that the district court erred in two respects: first, in placing the burden of proof on the defendant to establish that Ms. Rizzo was a direct threat to the children she was transporting in the van, and; second, in failing to grant defendant's motion for judgment as a matter of law on grounds that the plaintiff failed to produce sufficient evidence to support the implicit jury finding that she engaged in the interactive process to provide information to the employer about the extent of her disability.  We took this case en banc to consider these two issues.

II.

A.

3

CWLC first challenges the district court's charge to the jury, explaining which party had the burden of establishing that Ms. Rizzo was a direct threat to her student passengers.

In charging the jury, the district court first instructed the jury that the plaintiff, Rizzo, had the burden of proving the essential elements of her claim. The court explained that this required the plaintiff to prove that she was a qualified person with a disability or a person who "can perform the essential functions of the employment position . . . and who does not pose a 'direct threat' to the health and safety of herself or others." Neither party objected to this charge and no argument is advanced suggesting that it is erroneous.

The court's next instruction explained the employer's defense that Ms. Rizzo was removed as the school van driver because CWLC thought she posed a direct threat to the health and safety of herself and others. The district court -- faithful to our remand order in <u>Rizzo I</u> -- charged that the "defendant has the burden to prove by a preponderance of the evidence that a direct threat exists." No objection was made to this charge.[1]

_____

[1]The dissent disagrees with our reading of the record and takes the position that the defendant objected to the court's instruction placing the burden of proof on the defendant to establish its affirmative defense of "direct threat." Some background is helpful to understand why the objection the defendant points to on pages 452 and 453 (Volume V) of the record does not preserve this issue for appeal.

The direct threat issue was presented in the district court in two ways: First, plaintiff was required to prove, as one of the elements of her case, that she was a "qualified individual with a disability." The court defined this phrase as one who can perform the essential functions of the employment position without posing a "direct threat" to the health or safety of herself or others.

4

The question of who bears the burden of establishing that an individual's disability poses a direct health or safety threat to the disabled employee or others is not a simple one. A number of cases either hold or suggest that direct threat is an affirmative defense on which the defendant ordinarily has the burden of proof.[2] Other cases hold to the contrary.[3] Because neither side objected to either of the district court's instructions described above, we review this challenge for plain error.

As we stated in Highlands Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh, 27 F.3d 1027, 1031-1032 (1994):

> Federal Rule of Civil Procedure 51 is even more restrictive than Criminal Rule 52(b); indeed, one circuit holds that it allows no new attacks on instructions on appeal. We thus agree with the Sixth Circuit that "[t]he

The court instructed the jury that the plaintiff had the burden of proving this and other elements of her case. Second, the defendant asserted an affirmative defense that plaintiff was removed from driving the van because her employment in this capacity posed a "direct threat" to the health or safety of others. The court charged that the defendant had the burden of proving this affirmative defense.

The defendant's only objection at trial that related to the defendant's "direct threat" defense was to the court's failure to require the jury to answer a separate interrogatory on this defense. The defendant was concerned that without a separate jury issue on the defendant's affirmative defense, the jury would become confused and require the defendant to prove an element of the plaintiff's case--that Rizzo was a "qualified individual with a disability." Defendant makes a very different argument on appeal. Instead of arguing that the court should have given the jury a separate interrogatory on the defendant's affirmative defense, it argues that the court erred in assigning the burden of proof to it to establish this affirmative defense. The defendant's objection did not complain of the court's burden of proof instruction and this issue was not preserved for appeal.

[2] See EEOC v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1283-85 (7th Cir. 1995); Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247-48 (9th Cir. 1999); Hartog v. Wasatch Academy, 129 F.3d 1076, 1088-1089 (10th Cir. 1997); see also 29 C.F.R. § 1630.15(b)(2).

[3] Moses v. American Nonwovens, Inc. 97 F.3d 446, 447 (11th Cir. 1996); EEOC v. Amego, Inc., 110 F.3d 135, 142-44 (1st Cir. 1997).

principles and decision enunciated in <u>Olano</u> apply *a fortiori* in the civil context where courts pay less strict attention to procedural protocol." Olano augments this court's longstanding rule that reversal for plain error is "not a run-of-the-mill remedy" and will occur "only in exceptional circumstances to avoid a miscarriage of justice."

In allocating the burden of proof to the defendant to establish its defense, the district judge carefully followed the marching orders we gave him in <u>Rizzo I</u>.  In this circumstance we are therefore unable to say the district court committed error at all.  But, if we assume that the district court somehow committed error, it certainly was not plain or "obvious" error and we need not resolve the burden of proof issue raised for the first time on appeal.[4]

Turning to the sufficiency question, our review of the record persuades us that the evidence amply supports the jury's finding that Rizzo was able to drive the van safely and did not pose a direct threat to her passengers.  Ms. Rizzo produced evidence of her safe driving history and unblemished history of supervising the children without incident.  Rizzo also produced evidence that CWLC evaluated her skills and gave her a driving score in excess of the minimum needed to be able to drive the van.  She was experienced in

---

[4]It is unclear from the statutory scheme who has the burden on this issue. It may depend on the facts of the particular case.  The EEOC suggested at argument that where the essential job duties necessarily implicate the safety of others, the burden may be on the plaintiff to show that she can perform those functions without endangering others; but, where the alleged threat is not so closely tied to the employee's core job duties, the employer may bear the burden. <u>See also EEOC v. Amego</u>, 110 F.3d 135, 144 (1st Cir. 1997).  None of these issues were raised in the district court and all we decide today is that the district court did not commit plain error in its charge.

life saving procedures and possessed all licenses required by the State of Texas.

Rizzo's own testimony supported the conclusion that she had no difficulty supervising children on the bus. She testified about how she used the van's internal mirrors and how she kept order on the bus. The evidence was clearly sufficient to support this jury finding.

**B.**

CWLC argues next that Ms. Rizzo failed to communicate with it to provide sufficient information about her disability to allow the employer to evaluate whether she could perform the job safely.

The district court--as part of its charge on reasonable accommodation--explained the obligations of the employer and employee to communicate with each other about the employee's disability and how that disability relates to job performance.[5]

---

[5]The court charged as follows:

For example, the individual needing the accommodation may not know enough about the equipment used by the employer or the exact nature of the work site to suggest an appropriate accommodation. Likewise, the employer may not know enough about the individual's disability or the limitations that disability would impose on the performance of the job to suggest an appropriate accommodation.

Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process. This determination must be made in light of the circumstances surrounding a given case. If the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possesses, the employer has made a good faith effort of accommodation.

An employer does not have the responsibility to go in search of information, such as medical advice, that is uniquely in the hands of the

7

In rendering a verdict for the plaintiff, the jury implicitly found no inadequate responsiveness by Ms. Rizzo in providing necessary information about her condition. No objection was made to this charge so the question narrows to whether the evidence is sufficient to support this implicit finding. Viewing the evidence in a light favorable to the verdict, our review of the record persuades us that the evidence is sufficient.

It is undisputed that before the parent expressed concern that Ms. Rizzo could not safely drive the van and supervise the children, CWLC knew a number of important facts: Ms. Rizzo possessed a commercial driver's license; she had taken and passed all of the written and performance criteria established by CWLC relating to van driving; and finally, no one had ever reported to appellant that Ms. Rizzo had failed to safely drive the van and supervise the children. In fact, the parent who expressed concern about Ms. Rizzo did not observe her engaging in any unsafe practices.

In response to the statement made by the concerned parent, appellant's director, Ms. Ryan, told Ms. Rizzo that she was concerned about whether Ms. Rizzo could hear a siren and whether she could hear a child choking in the van. Ms. Ryan told Ms. Rizzo that she could no longer drive the van until CWLC satisfied itself

employee, particularly when the employee appears not to have been particularly responsive to requests for further information.

8

that she could do it safely. Following this meeting, Ms. Ryan indicated to Ms. Rizzo that CWLC would have an audiologist test Ms. Rizzo at the school. Despite inquiry by Ms. Rizzo, CWLC never arranged for such a test. Approximately three weeks later Ms. Rizzo went to her own audiologist. After testing her hearing, the audiologist reported that Ms. Rizzo should have no difficulty hearing a siren. Ms. Rizzo delivered the audiologist's report to Ms. Ryan and told her to call the audiologist if she had any questions. When Ms. Rizzo asked Ms. Ryan whether CWLC planned to have an audiologist test her at the school, Ms. Rizzo received no definitive answer. Ms. Ryan finally told Ms. Rizzo that the matter was in the hands of Ms. Ryan's superior, Claudia Adame. When it became apparent to Ms. Rizzo that CWLC planned to take no further steps to resolve the question of whether her hearing impairment affected her ability to drive the van and supervise the children in the van, she resigned.

We are satisfied that the jury was entitled to conclude that Ms. Rizzo adequately communicated with CWLC about her hearing impairment and the effect of this impairment on her ability to safely drive the school van.


III.

For the above reasons, the judgment of the district court is

9

affirmed.[6]

---

[6]The dissent takes the position that Rizzo's proof failed as a matter of law to establish that Rizzo suffered an adverse employment action. We agree with the panel opinion (Rizzo II) that a reasonable jury could have concluded that when Rizzo was prohibited from driving the van, her hours were reduced by about 25% causing a similar reduction in her pay. This is sufficient evidence to establish an adverse employment action.

JONES and SMITH, Circuit Judges, with whom WIENER, Circuit Judge, joins, dissenting:

The result in this case is facially absurd: An employee whose numerous duties as assistant teacher and administrative aid include driving small children in the school van is asked temporarily not to drive until she can show that her poor hearing does not endanger her young passengers. For this purportedly reprehensible deed, done in the interest of child safety, the school must pay the impaired employee $100,000 plus attorney's fees.

Congress surely could not have intended such an outcome. We respectfully dissent.

I.

We agree with the majority to the extent that it resolves thorny substantive legal issues arising under the ADA. That is, the en banc majority, like the panel dissent, correctly concludes that the ADA requires employers and employees to engage in a good faith, interactive process of information exchange with regard to an employee's disability and the availability of reasonable accommodations. An employee who unreasonably fails to provide the employer with such information is thus precluded from pursuing an ADA action against his employer.

We disagree, however, with the majority's ultimate decision to affirm the judgment based on the verdict. The majority does so not

only in the face of serious doubts about whether Rizzo provided adequate information concerning the scope of her disability to CWLC, but also despite a fatal flaw in her *prima facie* case.

Specifically, Rizzo failed, as a matter of law, to prove that CWLC took any adverse employment action because of her disability, a necessary element of an action under the ADA. The majority, agreeing with the panel in *Rizzo II*,[7] dispenses with this issue in a single, perfunctory footnote. We would reverse and render on the ground that Rizzo did not present sufficient evidence of an adverse employment action to support the verdict.

We additionally are troubled by the majority's avoidance of substantive discussion of *Rizzo I*,[8] in which the panel assigned the burden of proof to the *employer* to show that an employee cannot safely perform an essential job function because of his disability and thereby poses a direct threat to the health or safety of others. *Rizzo I* was incorrectly decided. The majority, however, altogether avoids this sticky questionSSadmittedly made more difficult by facially inconsistent provisions of the ADASSby asserting that CWLC failed to raise the proper objection in district court. As we will explain, that position is untenable, because CWLC did adequately object.

---

[7] *See Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 260 (5th Cir. 1999) ("*Rizzo II*").

[8] *See Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 764 (5th Cir. 1996) ("*Rizzo I*").

12

The ADA does not prohibit *all* discrimination on the basis of disability, but only discrimination that produces an adverse employment action. The Act expressly prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual *in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.*"[9] Therefore, "[t]o establish a prima facie case under the ADA one must show: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was *subject to an adverse employment decision because of his disability.*"[10]

Rizzo not only voluntarily resigned her position, but did so over CWLC's pleas for her to stay and inquiries as to what it might do to keep her.[11] Rizzo alleges, however, that before her voluntary resignation, she was demoted; she presents two theories to establish her demotion.

First, she maintains that she lost wages from having to work a reduced, split schedule, and felt stigmatized by her new duties.[12]

---

[9] 42 U.S.C. § 12112(a) (emphasis added).

[10] *Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999) (emphasis added).

[11] *See Rizzo II,* 173 F.3d at 265 (Wiener, J., dissenting).

[12] *See id.* at 260-61; *id.* at 271 (Wiener, J., dissenting).

These actions may constitute a demotion, but an employee additionally must show that he was demoted *because of his disability*.[13] Rizzo made no such showing. To the contrary, she admitted that her new duties "were duties shared by all CWLC employees to varying degrees" and that "others also worked split shifts."[14]

The sole employment action for which there was evidence of impermissible discriminatory motive was CWLC's temporary suspension of Rizzo's driving duties.[15] That temporary employment action was taken, as CWLC readily concedes, as the direct result of parents' complaints regarding Rizzo's hearing disability in the context of express concerns for child safety. But suspensionSSor even permanent removalSSof driving duties alone does not constitute a demotion, for that employment action, alone, did not cause a change in pay or benefits.[16] And although there need not be a "decrease in

---

[13] *See Ivy*, 192 F.3d at 516.

[14] *Id.* at 271 (Wiener, J., dissenting). *See also id.* at 260.

[15] *See id*. at 261; *id.* at 271 (Wiener, J., dissenting).

[16] The majority incorrectly attributes a reduction in Rizzo's hoursSSand thus, her wagesSSto the suspension of her driving duties. In fact, Rizzo's wages were not reduced because of her hearing difficulties. When CWLC suspended her driving duties, CWLC simply reassigned her to perform other tasks to make up for those hours. Indeed, Rizzo never lost her status as a full-time employee, but continued to enjoy all the benefits of full-time employment.

Rizzo responds by asserting that her work hours nevertheless diminished. The dispositive issue, however, is not *whether* she worked less hours, but *why*. The record shows that it was *ordinary business fluctuations* resulting from the seasonal nature of daycare workSSand *not her loss of driving duties*SSthat caused Rizzo to receive reduced hours.

The weeks immediately following Rizzo's suspension of driving duties happened

14

pay, title, or grade" to constitute a demotion, an employee at least must show that his reassignment of duties "proves objectively worseSSsuch as being less prestigious or less interesting or pro-viding less room for advancement."[17]  "[A] 'bruised ego' is not enough."[18]

A reasonable juror could not conclude that the elimination of van-driving responsibilities from the duties assigned to an as-sistant teacher and administrative aide constitutes a demotion. There is nothing inherently prestigious or interesting or career-advancing about driving a van full of children.[19]  Rizzo therefore cannot make the necessary objective showing of discriminatory demo-tion through her reduction in duties.

---

to coincide with CWLC's lowest period of staffing need.  Rizzo fails to rebut CWLC's explanation with sufficient evidence that her reduced work hours were attributable to her loss of driving duties, rather than ordinary business fluc-tuations.  Beyond her own bare allegation, she cites only the testimony of Myra Ryan, CWLC's director.  But Ryan agreed merely with the fact that Rizzo's hours had decreased, and in fact expressly disagreed with counsel for Rizzo as to *why* that had occurred.

[17] *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999).

[18] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (quoting *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994)).

[19] Of course, our conclusion hereSSthat the removal of driving duties does not alone constitute a constructive demotion under *Sharp*SSdoes not affect our view expressed in part III hereof that, for purposes of assigning burden of proof, driving is an essential function of Rizzo's job.  The former determination turns on such factors as the level of pay, prestige and challenge of work, and opportunity for career advancement.  The latter, by contrast, is simply an employer's good-faith determination of what job functions are essential to a particular position.  Thus, a function could be essential to the employer while not commanding extra pay and being devoid of prestige, challenge, or other objective value, the loss of which could constitute a constructive demotion.

Because neither temporary suspension nor even permanent removal of driving duties alone qualifies as a demotion, and because she did not show any other disability-motivated adverse employment action, Rizzo failed to present a *prima facie* case of liability under the ADA. This court should therefore reverse and render judgment as a matter of law in favor of CWLC.

                                III.

Not only, however, does the majority look past the absence of an adverse employment action, but it also circumvents the significantly more challenging burden-of-proof issue by concluding that CWLC failed to object as required under FED. R. CIV. P. 51. The majority errs in saying that CWLC did not object and in refusing to address the validity of *Rizzo I* on that ground.

More importantly, as we have said, *Rizzo I* was incorrectly decided. Under the proper rule, the *employee,* not the employer, has the burden to prove that he can perform essential job functions safely notwithstanding his disability and does not thereby pose a direct threat to the health or safety of others in the workplace.

Unfortunately, we cannot rely on the text of the ADA to tell us how to assign the burden of proof, because different provisions conflict, and analogies to other federal employment discrimination laws are of limited utility. Nevertheless, under this circuit's pre-*Rizzo I* precedent, we have held that the rule crafted to ad-

16

judicate claims under the Rehabilitation Act applies to ADA cases as well.[20] Most persuasive, however, is the fact that the rule urged by the dissent in *Rizzo II* offers the most practical solution to this vexing problem.

### A.

To sustain an action under the ADA, an employee first must prove, as part of his *prima facie* case, that he is a "qualified individual with a disability." 42 U.S.C. § 12112(a). In other words, he has the burden to prove that he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8).[21] In the context of the ADA, ability to perform an essential function means, *inter alia*, doing so without constituting a direct threat.

Plainly, then, when discharging his burden of establishing the second element of a *prima facie* ADA caseSSqualification for the jobSSthe plaintiff must show that, in performing each essential function, he does not pose such a threat. Where, as here, the

---

[20] *See Rizzo II*, 173 F.3d at 272-73 (Wiener, J., dissenting) (citing *Daugherty v. City of El Paso*, 56 F.3d 695, 697-98 (5th Cir. 1995)).

[21] The ADA defers to an employer's determinations of the essential functions of a job. *See* § 12111(8) ("For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.").

function is (1) driving (2) a van (3) full of pre-school-age children (4) on public streets in a high-traffic urban area, an employee with a disability that has an obvious nexus to performing that job function in a safe manner must negate the threat.

True, the ADA also provides employers with the affirmative defense of showing a direct threat:

> It may be a defense to a charge of discrimination . . . that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation.

§ 12113(a). "The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." § 12113(b).

In other words, it is the *employee's* burden to prove that he is a *qualified individual with a disability* (which includes, in some cases, negating direct threat), and it is the *employer's* burden to establish that an employee poses a *direct threat* to the health or safety of other individuals in the workplace. These provisions, however, leave a troubling gap, one that is exposed by the facts of this case: Whose burden is it if, according to the employer, an employee is not a qualified individual because, as a result of his disability, his unsafe performance of an essential job function *renders* him a direct threat to others in the workplace?

18

On the one hand, imposing the burden on the *employee* requires him to prove that he is not a direct threatSSa rule that appears to conflict with § 12113(b), which assigns the burden, completely and without exception, to the employer to prove direct threat, and not to the employee to disprove such a threat. On the other hand, placing the burden on the *employer* requires it to show that the employee cannot perform an essential job function safelySSa rule that conflicts with provisions of the ADA that expressly assign the burden to the employee to prove that, as a qualified individual, he can perform all essential job functions.

To place the burden on the employer is to holdSSabsurdly, in our viewSSthat *unsafe* execution of job duties nevertheless constitutes *adequate* performance. This approach effectively rewrites the ADA to require an employee merely to prove his ability to "perform the essential functions of the employment position," § 12111(8), *without regard* "to the health or safety of other individuals in the workplace," § 12113(b). As a matter of statutory construction if nothing else, such a rule is untenable.

B.

Because the answer cannot be found in the statutory text, we are licensed to look to other sources for guidance. No obvious solutions appear from simply looking to other federal employment discrimination statutes. Nevertheless, this court has held that

19

the rule governing burden of proof under the Rehabilitation Act applies also to the ADA. *See Daugherty*, 56 F.3d at 697-98. *Rizzo I* therefore is flawed as a matter of *stare decisis*, violating our maxim that one panel cannot overrule another.

1.

In *Rizzo I*, 84 F.3d at 764, the panel held that "[a]n employee who is a direct threat is not a qualified individual with a disability. As with all affirmative defenses, the employer bears the burden of proving that the employee is a direct threat." In other words, the panel placed the burden to prove direct threat on the *employer*, and did so irrespective of whether the danger involves an essential job functionSSlabeling absence of direct threat as a qualifier to be a handicapped employee covered by the ADA, yet impermissibly shifting to the employer the employee's burden of proving his qualification.

This approach mirrors that taken with regard to the *bona fide* occupational qualification defense provided in other federal employment discrimination statutes such as title VII and the ADEA.[22] Under those provisions, the *employer* has the burden to justify the otherwise unlawful discrimination shown by the employee by pleading

---

[22] *See* 42 U.S.C. § 2000e-2(e) (title VII); 29 U.S.C. § 623(f) (ADEA).

20

and proving a business necessity defense.[23]  As this circuit has noted with respect to title VII, placing the burden of proof on the employer to defend discriminatory acts on the basis of business necessity is consistent

> with the purpose of the ActSSproviding a foundation in law for the principle of nondiscrimination. [Otherwise,] the exception will swallow the rule. . . .  [T]he principle of nondiscrimination requires that we hold that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.[24]

The analogy is less than perfect, however.  Unlike the ADA, which expressly applies only to "*qualified* individual[s],"[25] title VII and the ADEA broadly protect "*any* individual,"[26] limiting references to an employee's ability to do the job to the provisions governing the *bona fide* occupational qualification defense.

This is not to say that a title VII or ADEA plaintiff is *not* required, as part of his *prima facie* case, to prove he is

---

[23] *See Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 232 (5th Cir. 1969) (title VII); *EEOC v. Univ. of Tex. Health Science Ctr.*, 710 F.2d 1091, 1093 (5th Cir. 1983) (ADEA).

[24] *Weeks*, 408 F.2d at 235.

[25] *See* 42 U.S.C. § 12112(a) (prohibiting discrimination "against a *qualified* individual with a disability because of the disability of such individual") (emphasis added).

[26] *See* 29 U.S.C. § 623(a)(1) (prohibiting discrimination "against any individual . . . because of such individual's age"); 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination "against any individual . . . because of such individual's race, color, religion, sex, or national origin").

qualified.  After all, failure to make such a showing constitutes failure to prove discrimination; an employer need merely present inability as the real motive behind the adverse employment action.[27] But the distinction does undermine the analogy between disability discrimination, on the one hand, and age or sex discrimination on the other.  It evinces Congressional understandingSSnot to say common senseSSthat an employee's ability to do the job, and to do so safely, is a matter of heightened concern when it comes to disability, and has a special meaning not present in the context of age or sex.  Any reasonable legal regime that condemns employment discrimination should therefore acknowledge and incorporate this distinction.

2.

A closer analogy might be found in the Rehabilitation Act, which prohibits recipients of federal funding from discriminating against an "otherwise qualified individual with a disability . . . by reason of her or his disability."  29 U.S.C. § 794.  Under that statute, "the burden lies with the plaintiff to show that he is otherwise qualified," and he is "otherwise qualified" only if he "'can perform the essential functions of the position in question

---

[27] *See, e.g., Sreeram v. Louisiana State Univ. Med. Ctr.SSShreveport*, 188 F.3d 314, 318 (5th Cir. 1999) (holding that plaintiff "failed to establish a prima facie case of sex and/or national origin discrimination because she failed to establish that she was qualified for the position in question at all relevant times").

without endangering the health and safety of [himself] or others.'"[28]

Even here the analogy is imperfect. Although the protected classSSdisabled individualsSSis the same under both acts, the Rehabilitation Act, unlike the ADA, offers no explicit exception to liability for business necessity or workplace safety, whether as part of the employee's *prima facie* case or as an affirmative defense. The *Chandler* court thus was forced to construct an exception, using the "otherwise qualified" language as its statutory hook:

> Taken literally, "otherwise qualified" could be defined to include those persons who would be able to meet the particular requirements of a particular program "but for" the limitations imposed by their handicaps. The Supreme Court, however, expressly disapproved of such an interpretation because of the absurd results that would be produced. "Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise qualified' for the job of driving. Clearly, such a result was not intended by Congress." The Supreme Court instead defined an otherwise qualified person as "one who is able to meet all of a program's requirements in spite of his handicap."[[29]]

In light of the scheme of the Rehabilitation Act, which prohibits discrimination against "otherwise qualified" individuals, without discussion of defenses or justifications, it was only natural to

---

[28] *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993) (quoting *Chiari v. City of League City*, 920 F.3d 311, 317 (5th Cir. 1991) (quoting 29 C.F.R. § 1613.702(f) (1990))).

[29] 2 F.3d at 1393 (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 407 n.7 (1979)).

place the burden on the plaintiff.

Quite arguably, the ADA shows that Congress learned its lesson from the Rehabilitation Act, for the ADA not only expressly mentions both business necessity and workplace safety, but also lists them as affirmative defenses for employers.[30]  As we have discussed, other, conflicting provisions of the ADA prevent us from ending the analysis there.  Nevertheless, the very existence of these affirmative defense provisions should give some pause before we incorporate the Rehabilitation Act caselaw into our ADA jurisprudence.

3.

This court, however, already has confronted the strengths and weaknesses of analogizing the ADA to the Rehabilitation Act.  Perhaps adopting the old adage not to let the perfect be the enemy of the good, we applied the Rehabilitation Act framework for burden of proof to the ADA, and did so before *Rizzo I* was decided.

In *Daugherty*, 56 F.3d at 697, we stated that "[t]he elements of a cause of action at issue in our case . . . are virtually the same under the Rehabilitation Act and the ADA."  The *Daugherty* court went on to incorporate explicitly the *Chandler* rule into the ADA:

> In *Chandler*, we [stated that] . . . [a]n otherwise qual-

---

[30] *See* 42 U.S.C. § 12113(a)-(b).

ified handicapped individual is defined as one who can perform the *essential functions of the position* in question *without endangering the health and safety of the individual or others*. . . . [T]his holding likewise compels us to hold that under the ADA Daugherty is not a qualified individual with a disability for the position of bus driver. This *essential element of his claim* is lacking.

*Daugherty* thus teaches that an employee's ability to perform essential job functions safely is part of his *prima facie* case, under the ADA no less than under the Rehabilitation Act. Therefore, the *Rizzo I* panel erred in placing the burden of proof on the employer.

### C.

Because the text of the ADA is unyielding and beyond rehabilitation, and analogies to other federal employment discrimination statutes are of little help, courts are left with no choice but to construct a rule that makes the best sense, while adhering as closely as possible to what we can discern Congress would have wanted. As we have seen, an obvious alternative to the rule of *Rizzo I* is to place the burden on the *employee*, as we did in *Daugherty*.[31] That is the approach urged by the dissent in *Rizzo II*[32] and is the law in the First and Eleventh Circuits.[33]

---

[31] *See Daugherty*, 56 F.3d at 697-98.

[32] *See* 173 F.3d at 273 & n.64 (Wiener, J., dissenting).

[33] *See EEOC v. Amego*, 110 F.3d 135, 144 (1st Cir. 1997) (stating that "in a Title I ADA case, it is the plaintiff's burden to show

25

This rule requires the *employee* to disprove that he is a direct threat to others, though only within the context of an *essential* job function. It would still leave it to the *employer* to prove direct threat either where an employee is unable safely to perform a *non-essential* job function, or where his disability only renders him a threat to the workplace generally.[34]

Take this case as an example. Rizzo suffers from a hearing disability that, according to CWLC, renders her unable to drive children safelySSone of the essential functions of her job. The disability therefore directly implicates her ability to do that job. Under the rule advocated by the dissent in *Rizzo II*, she, as the *employee*, has the burden to prove she can drive safely.

There is much to be said on principle for this distinction between the ability to perform a particular job function safely, on the one hand, and being a general threat to the health or safety of

_____

that he or she can perform the essential functions of the job, and is therefore 'qualified.' Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others. There may be other cases under Title I where the issue of direct threat is not tied to the issue of essential job functions but is purely a matter of defense, on which the defendant would bear the burden."); *Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996) (holding that, where "[e]ach of Moses's assigned tasks presented grave risks to an employee with a seizure disorder," "[t]he employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available").

[34] Rizzo must contend that driving a bus is an essential function of her position. If it were not, CWLC could have made an offer "she couldn't refuse" to accommodate her by replacing that non-essential function with other duties.

26

others in the workplace, on the other hand.  It recognizes that we may have special cause for suspicion when an employer justifies discrimination not on the relatively concrete and more readily measurable basis of ability to perform a particular essential job function safely, but because of a proffered generalized concern about health and safety.  "Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.  Even those who suffer or have recovered from such noninfectious diseases as epilepsy or cancer have faced discrimination based on the irrational fear that they might be contagious."[35]

We therefore may have reason to be particularly wary of an employer who asserts generalized rather than job-function-specific justifications.  It is reasonable to allocate the burden of proof accordingly and to assume that Congress had *Arline* in mind when it enacted the ADA.[36]

Admittedly, nothing in the text of the direct-threat provision supports this distinction.  But this approach does at least preserve some role for § 12113(b), by requiring employers to prove direct

---

[35] *School Bd. v. Arline*, 480 U.S. 273, 284 (1987).

[36] *See* Jeffrey A. Van Detta, *"Typhoid Mary" Meets the ADA: A Case Study of the "Direct Threat" Standard Under the Americans with Disabilities Act*, 22 HARV. J.L. & PUB. POL'Y 849, 857-58, 860 (1999) ("The 'direct threat' standard had its genesis in litigation involving employees with contagious diseases under the Rehabilitation Act of 1973 [citing *Arline*]. . . .  When Congress considered the legislation that became the ADA, it used *Arline* as a starting point for grappling with disqualification of employees due to safety risks.").

threat when the issue does *not* concern an employee's ability to perform an essential job function.

In conclusion, the rule endorsed by the dissent in *Rizzo II* offers a practical, balanced solution to the problem, one to which the ADA unfortunately has left no answer. By placing the burden on the employee with regard to essential job functions and on the employer for generalized, non-functional health concerns, it enforces the Congressional mandate that unjustifiable discrimination on the basis of disability is intolerable, while recognizing the reality that disability raises legitimate questions of employee qualification unique in employment discrimination law.

By distinguishing between essential job functions on the one hand and other, generalized health and safety concerns on the other, this rule reflects the fact that our most intense suspicions of untoward motivation are triggered when merely generalized concerns, lacking a basis in a concrete, particular essential job function, are put forth to justify discrimination on the basis of disability. Having found the right answer in *Daugherty*, this court ought not to have departed from it in *Rizzo I*.

IV.

The majority says it need not address *Rizzo I* because CWLC failed to file a proper objection. We disagree.

Counsel for CWLC did object. The original instructions direct-

28

ed the jury to place the burden on Rizzo to prove she was a qualified individual with a disability, and the burden on CWLC to prove Rizzo constituted a direct threat to others in the workplace. The instructions further stated, however, that Rizzo would not be a qualified individual with a disability should the jury find that she posed a direct threat to othersSSas *Rizzo I* itself suggested.[37]

Accordingly, CWLC was concernedSSand understandably soSSthat the repeated reference to direct threat would confuse the jury and mislead it to believe that CWLC not only had to prove direct threat, but also had to disprove Rizzo's qualifications *in toto*, including absence of direct threat. CWLC thus objected and requested a clarification, which the court denied. Having failed to obtain an additional instruction clarifying that Rizzo, and not CWLC, had the burden to prove that she was a qualified individual, CWLC must have found it futile to seek further instruction that Rizzo, and not CWLC, had the burden to prove ability to perform essential job functions safely and in a non-threatening way.

Moreover, CWLC's sense of futility must have been particularly

---

[37] *See Rizzo I*, 84 F.3d at 764 ("An employee who is a direct threat is not a qualified individual with a disability. As with all affirmative defenses, the employer bears the burden of proving that the employee is a direct threat."). This statement is itself contradictory: An employee has the burden of proving that he is a "qualified individual," which he cannot be if there exists a direct threat in his performance of an essential function; therefore, at least at that stage, proof of direct threat should not be the employer's burden. Only if the employee establishes a *prima facie* case that includes performing each essential function safely (i.e., no direct threat in the physical performance *per se*) is the employer put in the position of having to advance and prove any affirmative defense, including generalized threats to health and safety from the employee's presence in the workplace.

daunting in light of the express language of *Rizzo I*.[38]  To be sure, as a general matter FED. R. CIV. P. 51 provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."  But the rule is not without exceptions. "[F]ailure to object may be disregarded if the party's position has previously been made clear to the court and it is plain that a further objection would have been unavailing."[39]  For example, where, "[a]t the time of the trial, the prevailing Fifth Circuit rule did not require submission of the requested charge . . ., further objection by the appellants would have been fruitless." *Id.* Objection here would have been similarly fruitlessSSand thus similarly excusedSSfor we had just recently sent the court direct instructions regarding burden of proof in *Rizzo I*.

Given not only CWLC's request for clarification on the proper scope of each party's burden, but also the binding language of *Rizzo I*, the fundamental purpose of rule 51SSto apprise the court of the legal issues in the caseSSwas amply served here.  CWLC's argument therefore was preserved adequately for appeal.

---

[38] *See Rizzo I*, 84 F.3d at 764 ("As with all affirmative defenses, the employer bears the burden of proving that the employee is a direct threat.").

[39] *Lang v. Texas & Pac. Ry.*, 624 F.2d 1275, 1279 (5th Cir. 1980).

V.

In summary, the ADA is not a paragon of legislative drafting. Particularly impenetrable is the statutory allocation of burden of proof regarding an employee's qualifications and the threat that disabled employees might pose to health and safety. The most realistic and principled resolution of this dispute would have been to reverse and render judgment for CWLC for want of an adverse employment action and to take any appropriate opportunity to address the facially conflicting provisions of the ADA on burden of proof of direct threat. Therefore, we respectfully dissent.