

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-15-2007

# New Directions v. Reading

Precedential or Non-Precedential: Precedential

Docket No. 05-4353

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"New Directions v. Reading" (2007). *2007 Decisions*. Paper 842.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/842

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No:  05-4353

NEW DIRECTIONS TREATMENT SERVICES, on its own
behalf and on
behalf of its patients; ANGEL DOE; DAN COE; JOSEPH
JOE;
LOUIS LOE; CARLOS POE; PETER VOE, on their own
behalf
and on behalf of the class,

Appellants

v.

CITY OF READING; VAUGHN SPENCER, City Council
President, in
his official capacity, and City Council Members; ANGEL
FIGUEROA; GEORGE KERNS; MICHAEL D. SCHORN;
DENNIS STERNER;
DONNA REED; JEFFREY WALTMAN; CASEY
GANSTER, In their
individual and official capacities

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No.: 04-cv-1311
District Judge: The Honorable Paul S. Diamond

Argued on December 11, 2006

Before: SMITH and ROTH, *Circuit Judges*,
and IRENAS, *District Judge*[*]

(Filed: June 15, 2007)

Michael Churchill
Barbara E. Ransom (argued)
Public Interest Law Center of Philadelphia
125 South 9th Street
Suite 700
Philadelphia, PA  19107
　　*Counsel for Appellants*

Steven K. Ludwig (argued)
Fox Rothschild
2000 Market Street
10th Floor
Philadelphia, PA  19103
　　*Counsel for Appellees*

---

[*] The Honorable Joseph E. Irenas, Senior District Judge for the United States District of New Jersey, sitting by designation.

---

OPINION

---

SMITH, *Circuit Judge*.

This case presents the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-backyard. New Directions Treatment Services, a reputable and longstanding provider of methadone treatment, sought to locate a new facility in the City of Reading. A Pennsylvania statute that facially singles out methadone clinics gave the City of Reading the opportunity to vote to deny the permit. The City of Reading availed itself of that opportunity.

New Directions and individual methadone patients brought suit on constitutional and federal statutory grounds, raising both facial and as applied challenges to the statute. The City of Reading successfully moved for summary judgment against all of plaintiffs' claims. New Directions and the individual plaintiffs' appeal is before us.

## I. Summary of facts and procedural history

New Directions Treatment Services ("NDTS") operates several methadone clinics throughout Pennsylvania, including

one in West Reading.[1]   NDTS provides methadone

[1]The National Institute on Drug Abuse (part of the National Institutes of Health) describes methadone treatment:

> Methadone treatment has been used for more than 30 years to effectively and safely treat opioid addiction. Properly prescribed methadone is not intoxicating or sedating, and its effects do not interfere with ordinary activities such as driving a car. The medication is taken orally and it suppresses narcotic withdrawal for 24 to 36 hours. Patients are able to perceive pain and have emotional reactions. Most important, methadone relieves the craving associated with heroin addiction; craving is a major reason for relapse. Among methadone patients, it has been found that normal street doses of heroin are ineffective at producing euphoria, thus making the use of heroin more easily extinguishable.

> Methadone's effects last four to six times as long as those of heroin, so people in treatment need to take it only once a day. Also, methadone is medically safe even when used continuously for 10 years or more. Combined with behavioral therapies or counseling and other supportive services, methadone enables patients to stop using heroin (and other opiates) and return to more stable and productive lives.

treatment.

The Office of National Drug Control Policy (of the Executive Office of the President) provides further information on methadone treatment:

> Background Information
>
> Methadone is a rigorously well-tested medication that is safe and efficacious for the treatment of narcotic withdrawal and dependence. For more than 30 years this synthetic narcotic has been used to treat opioid addiction.
>
>               \* \* \*
>
> Methadone reduces the cravings associated with heroin use and blocks the high from heroin, but it does not provide the euphoric rush. Consequently, methadone patients do not experience the extreme highs and lows that result from the waxing and waning of heroin in blood levels. Ultimately, the patient remains physically dependent on the opioid, but is freed from the uncontrolled, compulsive, and disruptive behavior seen in heroin addicts.
>
> Withdrawal from methadone is much slower than that from heroin. As a result, it is possible to maintain an addict on methadone without harsh side effects. Many MMT [methadone maintenance treatment] patients require

5

continuous treatment, sometimes over a period of years.

Methadone maintenance treatment provides the heroin addict with individualized health care and medically prescribed methadone to relieve withdrawal symptoms, reduces the opiate craving, and brings about a biochemical balance in the body. Important elements in heroin treatment include comprehensive social and rehabilitation services.

Availability of Treatment

About 20% of the estimated 810,000 heroin addicts in the United States receive MMT (American Methadone Treatment Association, 1999). At present, the operating practices of clinics and hospitals are bound by Federal regulations that restrict the use and availability of methadone. These regulations are explicitly stated in detailed protocols established by the U.S. Food and Drug Administration (FDA). Additionally, most States have laws that control and closely monitor the distribution of this medication.

In July 1999 the U.S. Department of Health and Human Services released a Notice of Proposed Rulemaking (NPRM) for the use of methadone. For the first time in more than 30 years, the

NPRM proposes that this medication take its rightful place as a clinical tool in the treatment of the heroin addict. Instead of its use being mandated by regulations, programs will establish quality assurance guidelines and have to be accredited. The proposed new system will allow greater flexibility by the treating physician and ensure appropriate clinical management of the patient's needs. This proposed change in policy would eliminate most of the current regulations and allow greater clinical discretion for treatment by the physician. Accreditation establishes a clinical standard of care for the treatment of medical conditions. In the foreseeable future, clinic and hospital programs would be accredited by a national and/or State accrediting body. Responsibility for preventing the diversion of methadone to illicit use will remain with the Drug Enforcement Administration.

\* \* \*

Benefits

Evidence shows that continuous MMT is associated with several other benefits.

MMT costs about $13 per day and is considered a cost-effective alternative to incarceration (Office of National Drug Control Policy, 1998a).

MMT has a benefit-cost ratio of 4:1, meaning $4

in economic benefit accrues for every $1 spent on MMT (COMPA, 1997).

MMT has a significant effect on the spread of HIV/AIDS infection, hepatitis B and C, tuberculosis, and sexually transmitted diseases (COMPA, 1997). Heroin users are known to share needles and participate in at-risk sexual activity and prostitution, which are significant factors in the spread of many diseases. Research suggests that MMT significantly decreases the rate of HIV infection for those patients participating in MMT programs (Firshein, 1998).

MMT allows patients to be free of heroin addiction. The National Institute on Drug Abuse found that, among outpatients receiving MMT, weekly heroin use decreased by 69%. This decrease in use allows for the individual's health and productivity to improve (Office of National Drug Control Policy, 1998a). Patients were no longer required to live a life of crime to support their habit, and criminal activity decreased by 52% among these patients. Full-time employment increased by 24%. In a 1994 study of drug treatment in California, researchers found that rates of illegal drug use, criminal activity, and hospitalization were lower for MMT patients than for addicts in any other type of drug treatment program.

The Drug Abuse Treatment Outcome Study (DATOS) conducted an outpatient methadone treatment (OMT) evaluation examining the long-term effects of MMT (Hubbard et al., 1997). The pretreatment problems consisted of weekly heroin use, no full-time employment, and illegal activity. Results of the 1-year follow-up showed a decrease in the number of weekly heroin users and a reduction in illegal activity after OMT. There was no significant change in unemployment rates.

A Review

MMT is one of the most monitored and regulated medical treatments in the United States. Despite the longstanding efficacy of MMT, only 20% of heroin addicts in the United States are currently in treatment. The National Institutes of Health Consensus Development Conference on Effective Medical Treatment of Heroin Addiction concluded that heroin addiction is a medical disorder that can be effectively treated in MMT programs. The Consensus panel recommended expanding access to MMT by increasing funding and minimizing Federal and State regulations. Further research must be conducted on factors leading to heroin use and the differences among various users and their ability to end opiate

maintenance for adults who have been addicted to heroin for at least a year. NDTS's Executive Director, Glen Cooper, contacted the City of Reading ("the City") to discuss opening an additional treatment center, as their West Reading facility had developed a waiting list for treatment. NDTS met with City officials on January 24, 2001, to discuss potential sites within the City. NDTS met with the City Council two months later to continue the discussion. Although NDTS had not yet obtained an operating permit from the City, NDTS signed a ten-year lease on a property located at 700 Lancaster Avenue. NDTS then submitted a zoning permit application.

The Lancaster Avenue property is located on a commercial highway that is interspersed with 40-75 private residences. The Berks Counseling Center previously occupied the site, providing treatment to patients with mental health problems and drug addictions. It did not provide methadone treatment.[2] NDTS intended to serve "a couple

> addiction before the demand for heroin addiction treatment can be effectively met by increased MMT availability.

http://www.whitehousedrugpolicy.gov/publications/factsht/methadone/index.html.

[2]The website for the Berks Counseling Center, which has since relocated, describes its activities:

10

Our mission is to provide counseling and supportive services to enable individuals and families to achieve a healthy and more productive lifestyle

**Description:**
Our purpose is to offer addiction and mental health out patient treatment, case management, supportive services, and housing. Services extend to individuals, couples, families, adolescents and children. Our target population includes Berks County residents impacted upon by chemical dependency and/or mental illness. Berks Counseling Center (BCC) places a special emphasis on serving those persons who cannot access treatment elsewhere due to financial difficulties. We believe that community enlightenment and family strength are key components to the prevention and reduction of drug abuse. We have a satellite site at the Reading/Berks Emergency Shelter in order to better serve the population residing at the Shelter.

**History:**
Berks Counseling Center (BCC) is a private, non-profit corporation founded in October 1977 as Berks Youth Counseling Center. BCC is licensed by the State Dept. of Health, Division of Program Licensing; and the Dept. of Public Welfare, Office of Mental Health. BCC has been

hundred or so" methadone patients at the new facility. NDTS

---

> providing treatment services to the residents of center city Reading for the past 25 years. Additionally, BCC has provided both transitional (women and their children) and permanent housing for persons with disabilities for the past twelve years.

http://www.volunteersolutions.org/uwberks/org/220334.html. Glen Cooper, the Executive Director of NDTS, referred to the previous tenancy of the Berks Counseling Center at the same location in his comments before the City Council:

> The Berks Counseling Center was in the very building that we are proposing to put this facility in. They did exactly the same sort of work that we do: drug addiction treatment, mental health services.
>
> * * *
>
> We found what I think is a very good site where formerly heroin addicts were treated. I mean, the place that we're proposing is a former–very recently a former site for treating heroin addicts and mentally ill people. We're simply replacing or proposing to replace the agency which left there not too long ago, replace them with our own facility. And, you know, there were no problems when Berks Counseling Center was there that I'm aware of. They treated the same kind of people we treat. They were there for a long time.

12

proposed a 4,000 square foot addition to the property to accommodate this increased usage. NDTS planned to operate the new facility from 5:30 a.m. to 6:00 p.m. on weekdays, as well as more limited hours on weekends.

In 1999, Pennsylvania adopted 53 PA. CONS. STAT. ANN. § 10621, a zoning statute regulating locations of methadone treatment facilities.[3]     The     statute     provides     that     "a

_____

[3]The statute provides, in full, that:

> (a)(1) Notwithstanding any other provision of law to the contrary and except as provided in subsection (b), a methadone treatment facility shall not be established or operated within 500 feet of an existing school, public playground, public park, residential housing area, child-care facility, church, meetinghouse or other actual place of regularly stated religious worship established prior to the proposed methadone treatment facility.
>
> (2) The provisions of this subsection shall apply whether or not an occupancy permit or certificate of use has been issued to the owner or operator of a methadone treatment facility for a location that is within 500 feet of an existing school, public playground, public park, residential housing area, child-care facility, church, meetinghouse or other actual place of regularly stated religious worship

13

established prior to the proposed methadone treatment facility.

(b) Notwithstanding subsection (a), a methadone treatment facility may be established and operated closer than 500 feet to an existing school, public playground, public park, residential housing area, child-care facility, church, meetinghouse or other actual place of regularly stated religious worship established prior to the proposed methadone treatment facility if, by majority vote, the governing body for the municipality in which the proposed methadone treatment facility is to be located votes in favor of the issuance of an occupancy permit or certificate of use for said facility at such a location. At least 14 days prior to the governing body of a municipality voting on whether to approve the issuance of an occupancy permit or certificate of use for a methadone treatment facility at a location that is closer than 500 feet to a school, public playground, public park, residential housing area, child-care facility, church, meetinghouse or other actual place of regularly stated religious worship established prior to the proposed methadone treatment facility, one or more public hearings regarding the proposed methadone treatment facility location shall be held within the municipality following public notice. All owners of real property located within 500 feet of the proposed location shall be

14

methadone treatment facility shall not be established or operated within 500 feet of an existing school, public playground, public park, residential housing area, child-care facility, church, meetinghouse or other actual place of regularly stated religious worship established prior to the proposed methadone treatment facility," unless, "by majority vote, the governing body for the municipality in which the proposed methadone treatment facility is to be located votes in favor of the issuance of an occupancy permit." *Id*. at § 10621(a)(1) and (b). The Lancaster Avenue property falls within the ambit of the statute. When NDTS inquired about sites not covered by the statute, a City zoning official referred them to three sites, including a cemetery and a heavy industrial area, all of which NDTS considered unsuitable.

---

> provided written notice of said public hearings at least 30 days prior to said public hearings occurring.
>
> (c) This section shall not apply to a methadone treatment facility that is licensed by the Department of Health prior to May 15, 1999.
>
> (d) As used in this section, the term "methadone treatment facility" shall mean a facility licensed by the Department of Health to use the drug methadone in the treatment, maintenance or detoxification of persons.

53 PA. CONS. STAT. ANN. § 10621.

15

The City notified NDTS that it would hold a hearing on January 14, 2002. Glen Cooper, the Executive Director of NDTS, appeared at the hearing and described NDTS's history and its proposed treatment center. He also answered questions from the City Council. NDTS acknowledged that it had experienced some loitering and littering at its West Reading facility. At a second hearing on February 28, 2002, the Council heard additional public comments. At a March 25, 2002 Council meeting, the City heard more comments and then unanimously voted against NDTS's application.

NDTS filed complaints with the Pennsylvania Human Relations Commission ("PHRC") and the U.S. Department of Housing and Urban Development's Office of Fair Housing and Equal Opportunity ("HUD"). The PHRC dismissed NDTS's complaint in a letter stating that, "the facts of the case [did] not establish that probable cause exist[ed] to credit the allegations of unlawful discrimination." NDTS and several individual plaintiffs proceeding in pseudonym filed suit in the United States District Court for the Eastern District of Pennsylvania on March 25, 2004.

The complaint states four counts. First, NDTS alleged violations of the Fourteenth Amendment guarantees of Due Process and Equal Protection, stating that the Pennsylvania statute was unconstitutional on its face and as applied to the proposed Reading facility. Second, NDTS alleged that the statute, both facially and as applied, violates § 504 of the Rehabilitation Act. 29 U.S.C. § 794. Third, NDTS alleged that

16

the statute, both facially and as applied, violates Title II of the Americans with Disabilities Act ("ADA").  42 U.S.C. § 12132.  Fourth, NDTS alleged that the statute, both facially and as applied, contravenes the federal scheme for regulation of methadone treatment and is therefore preempted.  NDTS sought declaratory and injunctive relief for harm resulting from the City's purportedly discriminatory action.  Individual plaintiff methadone users also sought damages.

The City moved on September 3, 2004 to dismiss individual City officials on the grounds of common law quasi-judicial immunity and qualified immunity.  *See* FED. R. CIV. P. 12(c).  The District Court granted the motion on October 17, 2004.  NDTS does not appeal this decision.

The City moved for partial summary judgment with respect to the fourth count of the complaint, in which NDTS argued on Supremacy Clause grounds that the statute was preempted by federal law.  The District Court granted the motion and dismissed the fourth count on October 15, 2004.  NDTS does not appeal this decision.

NDTS and the individual plaintiffs filed the complaint as a class action and moved to certify the class on September 27, 2004, as "all persons residing in the City of Reading and its surrounding community who have been, are currently, or will be at risk of being on the waiting list to receive methadone treatment; and, all opiate-dependant residents of the City of Reading and its surrounding community who have needed, now

17

need or in the future may need methadone treatment." *See* FED. R. CIV. P. 23(b)(2). The District Court denied the motion without prejudice, reasoning that the Court lacked adequate information to determine if the individual plaintiffs could adequately represent the class.

The City moved for summary judgment. NDTS filed a cross-motion for partial summary judgment on their claims against the validity of the statute. The District Court granted the City's motion in its entirety and denied NDTS's cross-motion on August 22, 2005. NDTS timely appealed.

## II. Discussion

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over an appeal from the District Court's final order under 28 U.S.C. § 1291. We review the grant of summary judgment de novo. *Union Pac. R.R. v. Greentree Transp. Trucking Co.*, 293 F.3d 120 (3d Cir. 2002). This Court has conclusively settled that the proprietors of a proposed methadone treatment facility have standing to seek relief both on their own behalf and on behalf of their clients under both the ADA and Rehabilitation Act. *See Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 405-08 (3d Cir. 2005).

NDTS raises a myriad of issues on appeal. They argue (1) that 53 PA. CONS. STAT. ANN. § 10621 facially violates the Equal Protection Clause of the Fourteenth Amendment, the

18

ADA, and the Rehabilitation Act, (2) that the individual plaintiffs have standing to make out ADA and Rehabilitation Act challenges, (3) that the City violated the Equal Protection Clause of the Fourteenth Amendment, the ADA, and the Rehabilitation Act by denying NDTS a permit, and (4) that the District Court abused its discretion by denying the motion for class certification.

## 1. Whether 53 PA. CONS. STAT. ANN. § 10621 facially violates the ADA and the Rehabilitation Act

NDTS and the individual plaintiffs argue that 53 PA. CONS. STAT. ANN. § 10621 facially violates the Equal Protection Clause of the Fourteenth Amendment, the ADA, and the Rehabilitation Act. The District Court did not engage in a detailed analysis of the statute's validity under either Title II of the ADA or the Rehabilitation Act. Rather, the Court focused on the Equal Protection inquiry.[4] However, these inquiries are

---

[4] The District Court first analyzed the as applied and facial challenges to the statute under the Equal Protection Clause. The District Court held that these claims must fail because the City had asserted rational reasons for the permit denial and in support of the statute, including "substantial loitering and noise problems . . . [and] increased vehicular and pedestrian traffic, double parking, and repeated instances of patient jaywalking."

The District Court then held that the Plaintiffs' claims under the ADA and Rehabilitation Act could not survive summary judgment because "Plaintiffs must show that their

identity as heroin addicts or methadone users was the sole reason for the City's decision." The City concedes that this misstates our interpretation of the ADA, which requires that, "in pretext cases a plaintiff need prove only that the illicit factor 'played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.'" *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 158 (3d Cir. 1995) (citing *Miller v. CIGNA Corp.*, 47 F.3d 586, 598 (3d Cir.1995)); *see also Baird v. Rose*, 192 F.3d 462, 468-70 (4th Cir. 1999) (specifically rejecting the sole cause test for ADA claims).

The District Court appears to have overlooked that, despite the fact that Congress has directed the courts to construe the ADA and the Rehabilitation Act such that conflicting standards do not arise, see *Bragdon v. Abbott*, 524 U.S. 624 (1998), the ADA and the Rehabilitation Act are not exactly the same. The language of these two statutory provisions "regarding the causative link between discrimination and adverse action is significantly dissimilar." *Baird*, 192 F.3d at 468. Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" by specified entities. 29 U.S.C. § 794(a) (emphasis added). However, the ADA prohibits discrimination against an individual "*by reason* of such disability." 42 U.S.C. § 12132 (emphasis added). We squarely held in *Newman* that this language in the ADA clearly establishes that the "sole reason" standard adopted by the District Court is inapplicable to the ADA, which requires only but for causation. *See* 60 F.3d at

20

analytically distinct and must be approached accordingly.[5]

The principal difference between the equal protection and the ADA inquiry is that, in an as applied or facial equal protection challenge, the plaintiff bears the burden of negating all conceivable rational justifications for the allegedly discriminatory action or statute, *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001), whereas to make out a claim under the ADA, the plaintiff need only show that intentional discrimination was the *but for* cause of the allegedly discriminatory action. *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157-58 (3d Cir. 1995).[6]   A facially discriminatory statute based on a non-suspect class (such as 53 PA. CONS. STAT. ANN. § 10621) will survive an equal protection challenge unless it is based on a bare desire to harm a politically

---

157-158.

[5] We address the federal statutory challenges first, both because they involve a less stringent standard and because we have an obligation not to decide constitutional questions unless necessary. *See, e.g., Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944).

[6]We noted in *Newman* that "courts addressing the allocations of burdens of proof and persuasion under the ADA uniformly have looked for guidance to Title VII."  60 F.3d at 157.  The Supreme Court held in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), that, for Title VII cases, "because of" does not mean "solely because of."  *Id*. at 241.

unpopular group or "a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985). A statute that facially discriminates against disabled individuals, however, faces a far different and more skeptical inquiry under the ADA and Rehabilitation Act.

Section 12132 of Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This statement constitutes a general prohibition against discrimination by public entities, regardless of activity.[7] *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730-31 (9th Cir. 1999) (striking down a ban on methadone clinics within 500 feet of a residential area). Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). We have noted that

---

[7]The City of Reading is a qualifying public entity. *See* 42 U.S.C. § 12131(1)(A).

22

"[a]s the ADA simply expands the Rehabilitation Act's prohibitions against discrimination into the private sector, Congress has directed that the two acts' judicial and agency standards be harmonized" and we will accordingly analyze the two provisions together. *Newman*, 60 F.3d at 157-58; *see also Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir. 1997).

The Sixth and Ninth Circuits have considered the issue of whether a municipal ordinance prohibiting methadone clinics within 500 feet of a residential area violated the general proscription contained in the ADA and Rehabilitation Act. *See MX Group, Inc. v. City of Covington*, 293 F.3d 326, 342 (6th Cir. 2002); *Bay Area*, 179 F.3d at 737. Both Courts concluded that the ordinances were "facially discriminatory laws" and therefore "present[ed] per se violations of § 12132." *Bay Area*, 179 F.3d at 737; *see MX Group*, 293 F.3d at 342.[8]

---

[8]One District Court struck down an ordinance functionally identical to 53 PA. CONS. STAT. ANN. § 10621. *Smith-Berch, Inc. v. Baltimore County, Md.*, 115 F. Supp. 2d 520, 523 (D. Md. 2000). That Court reasoned that a statute that facially singled out methadone clinics imposed a disparate impact on methadone users. Although we agree with the Sixth and Ninth Circuits that such statutes are properly analyzed as facial violations of the ADA and Rehabilitation Act, we nevertheless concur with the *Smith-Berch* Court's ultimate conclusion. The District Court rejected the argument that a public hearing requirement was necessary to the local zoning scheme. *Id*. at

The Ninth Circuit confronted many of the issues presented in this case when the Bay Area Addiction Research and Treatment, Inc. ("BAART") and California Detoxification Programs, Inc. ("CDP") tried to relocate their methadone clinic to the City of Antioch, California. *Bay Area*, 179 F.3d at 727. BAART had been operating a methadone clinic near the courthouse in Pittsburg, California for 13 years. BAART and CDP received notice from Antioch that the proposed location could be used for a methadone clinic under Antioch's zoning plan. However, the Antioch City Council enacted an urgency ordinance banning methadone clinics within 500 feet of residential areas, thereby barring use of the proposed site. BAART and other plaintiffs alleged that Antioch had violated both Title II of the ADA and § 504 of the Rehabilitation Act. The District Court denied Bay Area's motion for a preliminary injunction enjoining the ordinance. BAART appealed. *See id*.

After disposing of issues not contested in the instant case, the Ninth Circuit analyzed whether the District Court had abused its discretion by denying the preliminary injunction in part because BAART did not have a likelihood of success on the merits. *Id*. at 733. The Ninth Circuit held that the District Court had abused its discretion by applying an erroneous legal standard and remanded the case. *Id*. The Ninth Circuit first

524. The *Smith-Berch* Court emphasized that there was no non-discriminatory reason to differentiate methadone treatment centers from other drug rehabilitation centers. *Id*.

24

held that the District Court erred by applying the "reasonable modification" test to a facially discriminatory law. *See id*. at 734-35. U.S. Department of Justice regulations require that would-be plaintiffs request reasonable modifications to avoid discrimination unless the modification would fundamentally alter the program, activity, ordinance, or statute. 28 C.F.R. § 35.130(b)(7). However, where the "statute discriminates against qualified individuals on its face rather than in its application," the applicable regulation interpreting Title II, which only requires "reasonable" accommodation, makes little sense. *Bay Area*, 179 F.3d at 734. The only way to alter a facially discriminatory ordinance is to remove the discriminating language. The Antioch ordinance could only have been "rendered facially neutral by expanding the class of entities that may not operate within 500 feet of a residential neighborhood to include all clinics at which medical services are provided, or by striking the reference to methadone clinics entirely," and, "[e]ither modification would fundamentally alter the zoning ordinance, the former by expanding the covered establishments dramatically, and the latter by rendering the ordinance a nullity." *Id*. Therefore, the reasonable modifications test could not apply to a facially discriminatory ordinance. *See id*. at 735 (holding that "facially discriminatory laws present per se violations of § 12132").

The Ninth Circuit noted that this determination does not end the inquiry, however, as both statutes withhold protection from any "individual who poses a significant risk to the health or safety of others that cannot be ameliorated by means of a

reasonable modification." *Id*. The Supreme Court developed the significant risk test in *School Board of Nassau County v. Arline*, a case involving a teacher who alleged a violation of § 504 of the Rehabilitation Act after she was discharged because she had an active case of tuberculosis. 480 U.S. 273, 276 (1987). The Supreme Court held that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." *Id*. at 287 n.16. The Court essentially incorporated a significant risk test into the Rehabilitation Act's definition of a disabled person qualified to receive § 504's protection. The Court noted that this test effectuates § 504's "goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns . . . as avoiding exposing others to significant health and safety risks." *Id*. at 287.

Although the Ninth Circuit disclaimed any conclusion about the outcome of this inquiry or the ultimate merits of the claim, it repeatedly emphasized that *Arline* was designed to "ensure[] that decisions are not made on the basis of 'the prejudiced attitudes or the ignorance of others,'" and that "[t]his is particularly important because, as with individuals with contagious diseases, '[f]ew aspects of a handicap give rise to the same level of public fear and misapprehension,' as the challenges facing recovering drug addicts." *Bay Area*, 179 F.3d at 736 (internal citations omitted) (citing *Arline*, 480 U.S. at 284). The Ninth Circuit held that, in order for a methadone

clinic to fail the significant risk test, it must present "severe and likely harms to the community that are directly associated with the operation of the methadone clinic." *Id*. at 736-37. Such alleged harms must be supported by evidence and "may include a reasonable likelihood of a significant increase in crime." *Id*. The Ninth Circuit noted that courts should be mindful of the ADA and Rehabilitation Act's goals of eliminating discrimination against individuals with disabilities and protecting those individuals "from deprivations based on prejudice, stereotypes, or unfounded fear." *Id*. at 737 (citing *Arline*, 480 U.S. at 287). Therefore, "it is not enough that individuals pose a hypothetical or presumed risk"–the evidence must reflect a risk that is significant and harm that is serious. *Id*.

Three years later, the Sixth Circuit invoked *Bay Area* and reached a similar result in *MX Group v. City of Covington*. 293 F.3d 326, 344-45 (6th Cir. 2002). MX Group is a for-profit operator of methadone clinics. *Id*. at 328-29. In 1997, they began the process of locating a suitable site for a methadone clinic in Covington, Kentucky. MX Group selected a location and Covington's zoning administrator issued them a permit. Public outcry spurred the Covington Board of Adjustment to overrule the issuance of the permit. MX Group located another suitable site, prompting the city solicitor to inform the zoning administrator that methadone clinics were not a permitted use anywhere in the city. Shortly thereafter, Covington adopted an amendment to the zoning code expanding the definition of "addiction treatment facility" in the zoning code to include any place whose primary function is to care for the chemically

27

dependent.  This term had applied only to programs that provided overnight or housing accommodations. The ordinance limited the number of all such facilities to one facility for every 20,000 persons in the city.  This amendment prevented MX Group from locating a facility in the city.  *Id*. at 330-31. However, the zoning administrator testified at trial that it was his impression from the city solicitor that amendments permitting individual clinics would be considered on a case-by-case basis.  *Id*. at 331.  MX Group brought suit pursuant to the ADA and Rehabilitation Act.  The District Court held that Covington's denial of the permit and the subsequently enacted amendment violated both federal statutes.  *Id*. at 328.

Covington alleged that the District Court had committed various errors of law, of which only one is relevant here–whether the District Court correctly concluded that MX Group was not required to request a reasonable modification. *Id*. at 334.  The Sixth Circuit cited *Bay Area* approvingly and rejected the "reasonable accommodation argument because it is inapplicable inasmuch as the ordinance at issue is facially discriminatory."  *Id*.  The Sixth Circuit noted that "the district court found that the blanket prohibition of all methadone clinics from the entire city is discriminatory on its face," agreed with that conclusion, and also agreed with the Ninth Circuit "that it would make little sense under these circumstances to require Plaintiff to seek an accommodation, when the only accommodation, a fundamental change to the ordinance, could not be considered reasonable."  *Id*. at 335.

28

Although *Bay Area* and *MX Group* dealt with outright bans, we believe that the reasoning of those cases is equally applicable here. The Pennsylvania statute imposes a ban on the establishment of methadone clinics within 500 feet of many structures, including schools, churches, and residential housing developments. *See* 53 PA. CONS. STAT. ANN. § 10621(a)(1). The Pennsylvania law differs from those in *Bay Area* and *MX Group* in that the "the governing body for the municipality in which the proposed methadone treatment facility is to be located" can waive the ban if, and only if, it approves the issuance of a permit by majority vote. 53 PA. CONS. STAT. ANN. § 10621(b). However, this ability of municipalities to waive the statutory ban in no way alters the fact that 53 PA. CONS. STAT. ANN. § 10621 facially singles out methadone clinics, and thereby methadone patients, for different treatment, thereby rendering the statute facially discriminatory.

We agree with the Sixth and Ninth Circuits that a law that singles out methadone clinics for different zoning procedures is facially discriminatory under the ADA and the Rehabilitation Act. We also agree that it is inappropriate to apply the "reasonable modification" test to facially discriminatory laws. *See MX Group*, 293 F.3d at 344-45; *Bay Area*, 179 F.3d at 734-35. The only way to modify a facially discriminatory statute is to remove the discriminatory language. However, amending 53 PA. CONS. STAT. ANN. § 10621 to remove the facial discrimination against methadone clinics would "fundamentally alter" the statute. *Bay Area*, 179 F.3d at 734.

29

Having concluded that 53 PA. CONS. STAT. ANN. § 10621 is facially discriminatory and that the reasonable modification test does not apply, we proceed to inquire whether NDTS's clients pose a significant risk. This inquiry is also referred to as the "direct threat" defense in cases arising under Title I of the ADA. *Bragdon v. Abbott*, 524 U.S. 624, 662 (1998) (Stevens, J., concurring). The Court's analysis of the Rehabilitation Act in *Arline* remains the guiding precedent. *See Arline*, 480 U.S. at 278-79. The Court concluded that contagious diseases such as tuberculosis fit within the Rehabilitation Act's definition of "handicapped," and then addressed the question of whether the plaintiff was otherwise qualified for her job as an elementary school teacher. *Id*. at 279. The Court held that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." *Id*. at 287 n.16. The Court adopted the language proposed by amicus curiae the American Medical Association, stating the significant risk inquiry should include consideration of four factors: the nature of the risk, the duration of the risk, the severity of the risk, and the probability that the potential harm will occur. *Donahue v. Consol. Rail Corp*., 224 F.3d 226, 231 (3d Cir. 2000) (citing *Arline*, 480 U.S. at 288).

The *Arline* Court limited its decision to cases where a significant risk is alleged on the basis of an infectious disease. *See* 480 U.S. at 289. The ADA and subsequent cases expanded the significant risk test to cases where a disability created a significant risk to the health or safety of others, such as attention

deficit hyperactive disorder, see *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295-96 (5th Cir. 1998), depression, see *EEOC v. Amego, Inc.*, 110 F.3d. 135, 143-45 (1st Cir. 1997), diabetes, see *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) , violent employees, see *Palmer v. Cir. Ct. of Cook County*, 117 F.3d 351, 353 (7th Cir. 1997), or epileptics whose jobs involve operating potentially dangerous machinery. *See Donahue*, 224 F.3d at 231.

The Supreme Court emphasized in *Bragdon v. Abbott* that the significant risk test requires a rigorous objective inquiry. 524 U.S. 624, 626 (1998). In *Bragdon*, a dentist refused to fill a cavity for an asymptomatic AIDS patient. *See id*. The Court held that:

> The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk of assessment must be based on medical or other objective evidence. . . . As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him of liability.

*Id*. at 649. Accordingly, we cannot base our decision on the subjective judgments of the people purportedly at risk, the Reading residents, City Council, or even Pennsylvania citizens,

31

but must look to objective evidence in the record of any dangers posed by methadone clinics and patients. The purported risk must be substantial, not speculative or remote. *See id.* at 649 ("Because few, if any, activities in life are risk free, *Arline* and the ADA do not ask whether a risk exists, but whether it is significant."). The Plaintiffs are not required to show that they pose no risk at all.[9] *See id.*

---

[9]Although the concept of significant risk has been much more fully considered in the Title I context, courts have not come to an agreement in either Title I or Title II cases as to where the burden lies. Some courts have held that whether there is a significant risk is a factor in whether a plaintiff is "qualified" within the meaning of the statute. These courts conclude that the plaintiff bears the burden of demonstrating that they do not pose a significant risk. *See Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209, 213 (5th Cir. 2000); *EEOC v. Amego, Inc.*, 110 F.3d 135, 142-44 (1st Cir. 1997). Other courts view "direct threat" as an affirmative defense. These courts reason that the burden is on the defendant to show that the plaintiff poses a significant risk. These courts note that the direct threat provision appears in a section of Title I entitled "Defenses." *See Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247-48 (9th Cir. 1999); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283-85 (7th Cir. 1995).

We have previously reserved judgment on this issue when it was "unnecessary to decide this question," and do so again in this case as it would not affect our holding. *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000).

The record contains ample evidence that NDTS's clients, and methadone patients as a class, do not pose a significant risk. Neither the City nor its amicus, the Commonwealth, have offered any evidence to the contrary. The City refers to the deposition of Glen Cooper, the Executive Director of NDTS, in which he estimated that 20 to 30 percent of the clinic's patients would test positive for illegal drugs. However, NDTS also submitted the results of drug screens at its West Reading and Bethlehem clinics showing that only patients enrolled for less than six months test positive at the 30 percent rate, whereas less than six percent of patients enrolled for more than six months test positive for illegal drugs.

More importantly, the record demonstrates no link between methadone clinics and increased crime. Cooper testified that there had been no criminal incidents at NDTS's West Reading facility. The Commonwealth offered no evidence to support its contrary assertion that there is a "frequent association" between methadone clinics and criminal activity. In depositions, City Council members expressed concerns about heavy traffic, loitering, noise pollution, littering, double parking, and jaywalking. However, the City offered no evidence to support an association between these concerns and methadone clinics. Even if such connections existed, we are skeptical that they would qualify as the substantial harms contemplated by the *Arline* and *Bragdon* Courts.

The brief legislative history of 53 PA. CONS. STAT. ANN. § 10621 provides no further evidence that methadone patients

33

pose a significant risk. Representative Platts, the bill's principal sponsor, stated that the legislation would protect "children from the high crime rates associated with heroin addicts," that, "[o]n average heroin addicts before treatment commit a crime on average 200 days of the year," and that "[e]ven after 6 months of methadone treatment, they still average once a month committing a crime." Representative Platts offered no source for this statistic. We find it difficult to place much weight on this unsupported statistic given Cooper's unrebutted testimony that other NDTS facilities had experienced no criminal incidents and the extremely positive reports of the National Institute on Drug Abuse and the Office of National Drug Control Policy. In addition, the statement of Representative Serafini betrays the generalized prejudice and fear warned against by the *Arline* Court:

> It is unfortunate that we have to have methadone treatment facilities at all, but to locate them in areas that are residential or close to where young people might congregate or the community might meet and gather is a definite mistake, and these facilities, in my opinion, do not benefit anyone but the heroin addict, and they should be located either in a community that welcomes this kind of facility or out in an area away from people who have kept themselves clean and free of drugs and should not be confronted by this kind of a pollution in their community.

On one hand, we have before us uncontroverted

34

testimony that NDTS's methadone treatment facilities have not experienced any criminal incidents or other potentially dangerous behavior. We have the objective viewpoints of the National Institute on Drug Abuse and the Office of National Drug Control Policy, brought to our attention by amicus curiae, the Pennsylvania Community Providers Association. On the other hand, neither the City nor amicus, the Commonwealth of Pennsylvania, offered any evidence in the proceedings below or in the statute's legislative history demonstrating that methadone patients pose a significant risk. The *Arline* Court specifically recognized that the Rehabilitation Act was meant to protect disabled individuals "from deprivations based on prejudice, stereotypes, or unfounded fear." 480 U.S. at 287; *see also Innovative Health*, 117 F.3d at 49. The speculative, hypothetical, and unsupported statements in 53 PA. CONS. STAT. ANN. § 10621's legislative history and in the record of the Reading City Council meeting do not suffice to create a triable issue of fact as to whether NDTS's clients, or methadone patients generally, pose a significant risk.

We have no doubt that some methadone patients are inclined to criminal or otherwise dangerous behavior. However, in the words of the *Arline* Court:

> The fact that *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act *all* persons with actual or perceived contagious

35

diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were "otherwise qualified." Rather, they would be vulnerable to discrimination on the basis of mythology–precisely the type of injury Congress sought to prevent.

480 U.S. at 285.

We will reverse the order of the District Court and remand with instructions that it grant NDTS's motion for partial summary judgment because 53 PA. CONS. STAT. ANN. § 10621 facially violates the ADA and the Rehabilitation Act. We need not reach the question of whether 53 PA. CONS. STAT. ANN. § 10621 facially violates the Equal Protection Clause of the Fourteenth Amendment, as the statute fails the less stringent tests required by the ADA and the Rehabilitation Act.[10]

---

[10]Plaintiffs argued before the District Court that § 504 of the Rehabilitation Act and Title II of the ADA preempt 53 PA. CONS. STAT. ANN. § 10621. As Plaintiffs do not argue this issue on appeal, it is waived.

## 2. Whether the individual plaintiffs have standing to make out ADA and Rehabilitation Act challenges

The Pennsylvania statute is facially invalid under the ADA and the Rehabilitation Act. Because of that, the individual plaintiffs' standing has no impact on the issue of injunctive relief. However, the individual plaintiffs also assert claims to damages under the ADA and the Rehabilitation Act. The District Court must reach the issue of the individual plaintiffs' standing in order to resolve their claims for damages.[11]

---

[11] We recognized in *Addiction Specialists, Inc. v. Township of Hampton* that methadone clinic providers may assert both direct standing based on their own injuries and associational standing based on injuries to the disabled individuals they serve. *See* 411 F.3d 399, 407 (3d Cir. 2005). A third-party may only assert claims based on the injuries of others to the extent that those who suffered the direct harm would themselves have standing to sue. *See Hunt v. Washington State Apple Adver. Comm'n.*, 432 U.S. 333, 343 (1977). Third-party standing is closely related to facial challenges, in which a single party asserts that a law is invalid not only as applied to them, but as applied to all parties that might come before the court. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973) ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be

asserted vicariously." (internal citations omitted)); *United States v. Raines*, 362 U.S. 17, 21 (1960).  *But see* Richard H. Fallon, *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1359-64 (2000) (examining the differences between facial challenges and third-party standing).

Therefore, every individual plaintiff harmed by the application of the Pennsylvania statute is not necessarily entitled to damages by virtue of NDTS's successful demonstration that the statute facially violates the ADA and Rehabilitation Act. Individual plaintiffs may have suffered a harm because the ease or timeliness of their methadone treatment was compromised by operation of the invalid statute.  However, if they are current users of illegal drugs, their statutory rights under the ADA and Rehabilitation Act have not been invaded–indeed, current users of illegal drugs are entirely exempted from the ambit of the statute when the allegedly discriminatory action was taken on the basis of that illegal drug use.  *See* 42 U.S.C. § 12210(a); 29 U.S.C. § 705(20)(C)(i).  Neither NDTS's associational standing nor its facial challenge can secure damages for individual plaintiffs when they themselves have not suffered a violation of their rights and lack standing.  Therefore, the District Court should consider the individual plaintiffs' standing under the ADA and Rehabilitation Act and, if the District Court finds that some of the individual plaintiffs lack standing, it should proceed to their as-applied equal protection challenge.

The fact that some plaintiffs were not harmed under the ADA and Rehabilitation Act does not necessarily support the facial validity of the Pennsylvania statute.  If the Pennsylvania General Assembly had passed a statute regulating only current illegal drug users, then the ADA and Rehabilitation Act could

The parties do not dispute that recovering heroin addicts are presumptively "qualified" persons under the ADA and Rehabilitation Act. *See* 42 U.S.C. § 12131; 29 U.S.C. § 794(a). However, both the ADA and the Rehabilitation Act contain carve-outs stating that individuals are not deemed "qualified" if they are "currently engaging in the illegal use of drugs" when the "covered entity [the City] acts on the basis of" the plaintiff's drug addiction. *See* 42 U.S.C. § 12210(a); 29 U.S.C. § 705(20)(C)(i). Plaintiffs are not considered "qualified" under the statutes if they have used illegal drugs "recently enough so that continuing use is a real ongoing problem." *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188 (9th Cir. 2001). This statutory exception is an odd fit for the instant case. It was intended to ensure that employers could discharge employees who were actually under the influence while at work and that employers could not discharge employees who were recovering addicts but were, at the time of any personnel action, drug free. *See id.* (quoting H.R. REP. NO. 101-596, at 62 (1990) (Conf. Rep.)). This provision makes its first appearance at 42 U.S.C. § 12114(a), where it applies to Subchapter I of the ADA, concerning employment. However, this provision reappears

---

not be offended if a covered entity took action based on that drug use. However, the record makes clear that methadone clinics serve a combination of current and rehabilitated drug users.

verbatim in "Subchapter IV: Miscellaneous Provisions," which makes it applicable to the entire ADA. This perplexing draftsmanship, which appears to make surplusage of the provision in the employment section, mandates that we apply this provision to Subchapter II, 42 U.S.C. § 12210(a)–even though it is unclear how the provision should apply outside the employment context.

First, NDTS contends that the appropriate time frame for this inquiry is 2004, when it filed the complaint in the District Court, similar to a traditional standing analysis. The City responds that the statutory text specifies that the relevant time frame is when the covered entity took its allegedly discriminatory action. We agree with the City inasmuch as both the ADA and Rehabilitation Act both state that an individual does not enjoy these statutory protections if "*currently* engaging in the illegal use of drugs, *when the covered entity acts* on the basis of such use." 42 U.S.C. § 12210(a); *see* 29 U.S.C. § 705(20)(C)(i) (same).

Less clear is the question of whether the City "acted on the basis of" the individual plaintiffs' addictions. *See* 42 U.S.C. § 12210(a); 29 U.S.C. § 705(20)(C)(i). The City asserts that it acted on the basis of non-discriminatory reasons, such as traffic and loitering. NDTS contends that the City acted on the basis of general fear and prejudice associated with recovering heroin addicts. NDTS wants to have its cake and eat it too. It claims that the City's allegedly discriminatory motive does not constitute action on the basis of a drug addiction, but action

40

against recovering addicts. However, much of the evidence in the record to which NDTS refers illustrates the City's concern about the possibility of NDTS's clients relapsing into drug use.

The ADA and Rehabilitation Act specifically provide that a person who has completed a supervised rehabilitation program or is currently participating in such a program and "is no longer engaging" in drug use shall be deemed a qualified individual. 42 U.S.C. § 12210(a) and (b)(1); 29 U.S.C. § 705(20)(C)(i) and (C)(ii)(I). The Ninth Circuit has observed that "[m]ere participation in a rehabilitation program is not enough," and that covered entities "are entitled to seek reasonable assurances that no illegal use of drugs is occurring." *Brown*, 246 F.3d at 1188. These statutory qualifications weigh against the logic of deeming the City to have acted solely on the basis of the plaintiffs' status as recovering addicts–even if we accept NDTS's version of the City's motivation.

The Second Circuit has recognized that the question of whether drug use is effectively ongoing or a serious problem is a fact bound inquiry best left to the district courts. *Teahan v. Metro-North Commuter R.R. Co.*, 951 F.2d 511, 518-20 (2d Cir. 1991). This determination requires detailed knowledge of methadone treatment protocols to assess whether a currently enrolled methadone patient who relapsed, for example, three months ago, is likely to relapse again. The parties do not dispute that one plaintiff, Coe, has been drug free for some time. However, three other plaintiffs, Joe, Loe, and Poe, had been drug free for only three months prior to the permit denial. *Id.*

41

We will remand with instructions that the District Court closely consider whether the individual plaintiffs' drug use posed a "real ongoing problem." *Brown*, 246 F.3d at 1188.

### 3. Whether the City violated the Fourteenth Amendment's guarantee of Equal Protection

The District Court should also consider NDTS's as applied challenge under the Equal Protection Clause of the Fourteenth Amendment if it finds that any of the individual plaintiffs lack standing under the ADA and the Rehabilitation Act. NDTS alleges the City improperly administered 53 PA. CONS. STAT. ANN. § 10621 as applied to their permit application for the Reading facility. The City replies that NDTS failed to show that prejudice was a motivating factor and, in the alternative, that the City met its burden of demonstrating a legitimate, non-discriminatory purpose.

The parties agree that classifications based on disabled individuals, such as recovering heroin addicts, are reviewed under the rational basis test which requires a rational means to serve a legitimate end. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (holding that the decision to refuse a permit to a home for the "mentally retarded" failed the rational basis test). Yet the City asserts that *Cleburne* "is distinguishable because unlike [NDTS], the Appellants [in *Cleburne*] had presented evidence that the decision to deny the special use permit for homes for the mentally retarded was based on mere negative attitudes and fear that was unsubstantiated by factors

42

which are properly cognizable." NDTS has adduced evidence of a similar character. The records of the City Council hearings contain numerous statements by both public participants and council members expressing opposition based on what can only be characterized as generalized prejudice, stereotypes, and fear of NDTS's clientele.[12]

---

[12]The records of the three City Council hearings are replete with statements by participants illustrating the atmosphere of prejudice and fear that permeated the proceedings. Participants stated that the new NDTS facility would "compromise the quality of life for children and families residing in this area," would disrupt "this stable, residential area," would "further decline the quality of life opportunities for families residing in the area," would "break [the] community spirit," would "have a detrimental effect on the family spirit of the neighborhood community," would "have a detrimental effect on the neighborhood and community businesses," and might "require additional police patrol." One participant opined that "the community would not be able to face the additional stress brought by the treatment facility." Another participant observed that:

> [T]he overall community opposes the location of the clinic on Lancaster Avenue. The community believes that the location of the clinic in this area will destroy neighborhood and family standards. [The community wants the] Council to recognize the effect this clinic will have on their community and property values. . . . [I]f existing hospitals

43

will not accept the clinic as a tenant, the medical profession may not believe in this type of treatment.

An attorney representing "citizens of the Millmont area," engaged in an extended colloquy with Glen Cooper, Executive Director of NDTS, at the initial City Council hearing on January 14, 2002:

> Attorney questions (Q): What do you tell the neighborhood that you're moving in, a community that you didn't investigate, the neighbors you didn't see, the residents whose property values may or may not be affected? What do you give them to suggest in some way their kids aren't going to be affected, their property is not going to be affected? How do you explain that to them?
>
> Cooper answers (A): Explain what?
>
> Q: Whether or not they will or will not be affected, their property values, if their kids will be involved with heroin addicts or ex-addicts or methadone addicts.
>
> A: I don't offer an explanation. I don't see that that's been an issue. It's never been an issue. . . . Do you have any evidence that that's an issue?
>
> Q: I suspect that common sense would tell anybody that they're not going to purchase a house next to a methadone clinic with heroin

addicts.

  A: I'm talking about children being involved. You raised the question about children being involved. Do you have any evidence? Do you have an example?

  Q: That children will be–children will be within 500 feet.

  A: That wasn't my question. My question was, Do you have evidence that that is a typical problem in relationship to methadone treatment facilities?

  Q: I have a daughter, and I don't want her near a methadone clinic.

  A: So, you don't have any evidence.

  Q: I do have personal evidence. I don't want my 10-year-old daughter at a methadone clinic or within 500 feet of a methadone clinic, if I can help it. And if I lived next to there, I would move.

  A: Well, you don't have any reason to believe, any statistical reason to believe, that that would be a problem. You just have a gut feeling that you wouldn't like it.

  Q: I'd use common sense.

City Council member Waltman stated "that this method of treatment condones addiction," and that "the City should be considering a Police substation for this area rather than a methadone clinic that will compromise the stability of the community." City Council member Kerns claimed that "the

We have suggested, albeit in a different context, that a factually similar claim would have a likelihood of success. *See Sullivan v. City of Pittsburgh*, 811 F.2d 171, 185 (3d Cir. 1987). We considered in *Sullivan* a request by recovering alcoholics for a preliminary injunction requiring issuance of a permit for the operation of a treatment center for alcoholics. *Id*. The *Sullivan* Court observed that:

> Appellees showed that the City's alleged concern about a drop in property values was irrational since ARC [the operator of the treatment centers] had operated in the neighborhood for some years and adduced evidence indicating that property values would not be adversely affected by the Center's presence. Appellees also established that the City's alleged concern with orderly development was irrational since ARC was already located in the North Side Section. Additionally, appellees demonstrated that ARC facilities met lot size and other zoning requirements and that the City's alleged concerns about density were addressed by density ordinances with which ARC had complied. And finally, here as in *Cleburne*, appellees demonstrated that the City took its essentially

potential damage a clinic could do that would break the community spirit."

46

> unjustified action in an atmosphere charged with hostility towards a minority group. These proofs, and their lack of contradiction by the City, lead us to conclude that, in light of *Cleburne*, class action plaintiffs-appellees are likely to prevail on the merits of their Equal Protection claim.

*Id*. (likening the recovering alcoholics' claim to that made in *Cleburne*).

The City claims that it met its burden of showing legitimate purposes motivating its decision. The District Court observed that the City Council expressed concerns about heavy traffic, loitering, noise pollution, littering, double parking, and jaywalking. Yet we consider it inexplicable that the City failed to offer any evidence to support these concerns. Indeed, the District Court appears to have relied on depositions of the Council members which are not supported by the records of the three City Council meetings. Records of these meetings contain no reference by the Council members to jaywalking, loitering, littering, double parking, or increased traffic. The only reference appears in Cooper's response to Council member Figueroa's general question about "problem[s] with citizens of West Reading," to which he responded that loitering and littering problems at its West Reading facility were minimal. The concern raised by Council member Reed in her deposition about double parking does not account for NDTS's statement that the new facility would have 20 off-street parking spaces.

47

The able District Judge also failed to adequately consider whether any of these asserted legitimate concerns differentiated the proposed NDTS facility from permitted uses of the 700 Lancaster Avenue site. *See Cleburne*, 473 U.S. at 448 (holding that the City of Cleburne could not treat the facility for the mentally retarded differently "unless [it] would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not"). On remand, the District Court should consider whether asserted legitimate purposes apply equally to permitted uses when deciding whether the purported legitimate purposes are pre-textual. *Id.* The Lancaster Avenue site is zoned commercial highway and therefore includes among its permitted uses gas stations, beer distributors, convenience stores, emergency health care facilities, motels, nightclubs, and miniature golf courses. The prior occupant, the Berks Counseling Center, treated recovering drug and alcohol addicts as well as mentally ill patients. The record contains no evidence of complaints from nearby residents. The District Court should focus particularly on whether there is any rational reason to differentiate methadone treatment centers, such as those operated by NDTS, from non-methadone drug treatment centers, such as the Berks Counseling Center.

A reasonable trier of fact could conclude, on the present record, that no "reasonably conceivable state of facts . . . could provide a rational basis" for denying NDTS's requested permit. *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001). What is presented, then, is a triable issue of material

48

fact.

## 4. Whether the District Court abused it discretion by denying the motion for class certification.

NDTS argues that the District Court abused its discretion by denying without prejudice their motion for class certification. The District Court's only stated reason was that NDTS had failed to "provid[e] Defendant with the information necessary for Defendant to determine whether the named class representatives can represent the class adequately." It is not clear what further information is required, as NDTS responded to all the City's requests for information on the named plaintiffs, including their identities.[13]

The named plaintiffs bear the burden of showing class eligibility and failed to file affidavits specifically in support of their motion for class certification. However, the District Court's denial of class certification does not provide sufficient information for us to engage in meaningful appellate review. We have held that "[a]dequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed

---

[13]The District Court granted the individual plaintiffs' motion to proceed in pseudonym on the same day it denied their motion for class certification. The District Court required only that the Defendant's counsel receive the individual plaintiffs' full names, which was duly done.

49

litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).

The City does not dispute that Plaintiffs' counsel are able to handle the litigation, supporting the conclusion that the class would be adequately represented. *See Grasty v. Amalgamated Clothing & Textile Workers Union, etc.*, 828 F.2d 123, 129 (3d Cir. 1987) (noting that "the assurance of vigorous prosecution" by class counsel is a "significant factor" in the Rule 23(a)(4) analysis); *Greenfield v. Villager Industries, Inc.*, 483 F.2d 824, 832 (3d Cir. 1973) ("Experience teaches that it is counsel for the class representative, and not the named parties, who direct and manage these actions.").

The record is sufficiently developed to support the conclusion that the named plaintiffs could adequately represent the class. Rule 23(a)(4)'s requirement that a class representative "fairly and adequately protect the interests of the class" mainly seeks "to uncover conflicts of interest between named parties and the class they seek to represent." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004); *see* FED. R. CIV. P. 23(a)(4). A class representative need only possess "a minimal degree of knowledge necessary to meet the adequacy standard." *Szczubelek v. Cendant Mortgage Corp.*, 215 F.R.D. 107, 119 (D.N.J. 2003). Conflicts of interest are rare in Rule 23(b)(2) class actions seeking only declaratory and injunctive

relief.[14]  *See* FED. R. CIV. P. 23(b)(2).  Further discovery is unlikely to reveal any actual or potential conflict.  The parties do not dispute that all of the class representatives' records were produced.

We are unable to perceive from the record or the briefs what additional information might be required to establish that there is no conflict of interest between the named individual plaintiffs and the other members of the putative class.  However, the District Court did not rule on the other Rule 23(a) factors, numerosity, commonality, and typicality.  Accordingly, we will vacate the District Court's order denying the motion for class certification.

## III.  Conclusion

Neither the record nor the legislative history of 53 PA. CONS. STAT. ANN. § 10621 contain any evidence that would preserve the statute against the guarantees provided by the ADA

---

[14]The City argues that there is doubt about whether the named plaintiffs can adequately represent the class because their claims for damages "predominate" over their request for injunctive relief.  *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 413 (5th Cir. 1998).  However, the individual plaintiffs seek damages only for themselves, and therefore they do not implicate possible future claims for damages by other members of the class.  Accordingly, the City's argument on this point lacks merit.

and the Rehabilitation Act.  We will reverse the judgment of the District Court denying summary judgment for NDTS with respect to the claim that 53 PA. CONS. STAT. ANN. § 10621 facially violates these federal statutes and remand for further proceedings consistent with this opinion.