**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1520
_____

KATRINA PARKER,
Appellant

v.

NEW JERSEY MOTOR VEHICLE COMMISSION;
B. SUE FULTON, in her official capacity as the
Chief Administrator of the New Jersey Motor Vehicle
Commission
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3:19-cv-08926)
District Judge:  Honorable Zahid N. Quraishi
_____

Argued: January 18, 2024

Before:  HARDIMAN, MATEY, and PHIPPS, *Circuit Judges*


(Filed: October 24, 2025)
_____

David J. Hommel, Jr.
William Juhn
Andrew Rozynski            **[ARGUED]**
EISENBERG & BAUM
24 Union Square E
4th Floor
New York, NY 10003

    *Counsel for Appellant*

Sookie Bae-Park
Brad Reiter                **[ARGUED]**
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
DIVISION OF LAW
25 Market Street
Hughes Justice Complex
Trenton, NJ 08625

    *Counsel for Appellees*

————————————————

OPINION OF THE COURT

————————————————

PHIPPS, *Circuit Judge*.

A hearing-impaired woman received endorsements for her New Jersey commercial driver's license that permitted her to drive a campus shuttle bus at a state university. But after she did so for about eight months, the state administrative agency that issued the endorsements recognized that she could not pass the requisite hearing tests and revoked the endorsements without a pre-revocation hearing. Instead of challenging the removal of those endorsements in state court, the woman initiated this lawsuit in the District Court against the state agency and its chief administrator under three anti-

2

discrimination statutes: Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and New Jersey's Law Against Discrimination. She also brought a civil rights claim under 42 U.S.C. § 1983 for a procedural due process violation because her endorsements were revoked without an individualized assessment of her ability to drive a shuttle bus. At summary judgment, the District Court rejected all of her claims. She now appeals, and on *de novo* review, we will affirm that judgment for the reasons below.

## I.   BACKGROUND

### A. Katrina Parker Obtains a Commercial Driver's License.

Complications from a bout with chicken pox at age three left Katrina Parker with a lifelong hearing impairment. In 2016, when she was 30 years old and living in New Jersey, Parker, who had a basic New Jersey driver's license, wanted to drive commercial motor vehicles.[1] To do that, she needed a commercial driver's license, or 'CDL,' issued by the State of New Jersey.[2] There are additional requirements for a CDL, and New Jersey, as part of its participation in a federal grant

---

[1] *See* N.J. Stat. § 39:3-10.11 (2010) (defining the term 'commercial motor vehicle'); *see also* 49 U.S.C. § 31132(1) (2012) (same).

[2] *See* N.J. Stat. § 39:3-10.18(a)(2) ("[A] person shall not operate a commercial motor vehicle unless the person has been issued and is in possession of a valid commercial driver license and applicable endorsements for the class and type of vehicle being operated."); *see also* 49 U.S.C. § 31311(a)(12)(A) (2012) (providing that, subject to exceptions, a "State may issue a commercial driver's license only to an individual who operates or will operate a commercial motor vehicle and is domiciled in the State").

3

program for improving commercial motor vehicle safety,[3] enacted legislation "designed to substantially conform" its laws to the federal standards for driving commercial motor vehicles. N.J. Stat. § 39:3-10.10.[4] One of those federal standards that New Jersey adopted through regulation, *see* N.J. Admin. Code § 13:60-2.1(b),[5] was the driver's ability to hear at a certain minimum level, specifically the ability to:

---

[3] *See* 49 U.S.C. § 31102 (2012) (establishing and providing funding for the Motor Carrier Safety Assistance Program).

[4] As a condition on participation in the Motor Carrier Safety Assistance Program, a state must have regulations and standards that are "compatible" with the Federal Motor Carrier Safety Regulations, or 'FMCSRs.' 49 U.S.C. § 31102(a) (2012). In 2016, the term 'compatible' for purposes of the program meant "State laws applicable to intrastate commerce are either identical to, or have the same effect as, the FMCSRs or fall within the established limited variances under § 350.341." 49 C.F.R. § 350.105 (2016). After a revision effective July 24, 2020, *see* Motor Carrier Safety Assistance Program, 85 Fed. Reg. 37,785, 37,785 (June 24, 2020), the definition of the term 'compatible' for purposes of the grant program was changed to mean "State laws, regulations, standards, and orders on [Commercial Motor Vehicle] safety that: (1) As applicable to interstate commerce not involving the movement of hazardous materials: (i) Are identical to or have the same effect as the FMCSRs; or (ii) If in addition to or more stringent than the FMCSRs, have a safety benefit, do not unreasonably frustrate the Federal goal of uniformity, and do not cause an unreasonable burden on interstate commerce when enforced." 49 C.F.R. § 350.105 (2020).

[5] *See generally* N.J. Stat. § 39:3-10.12(a) (authorizing the Chief Administrator to "adopt and administer a classified licensing system and a program for testing and ensuring the fitness of persons to operate commercial motor vehicles in accordance with the minimum federal standards established

perceive[] a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5—1951[.]

49 C.F.R. § 391.41(b)(11).

Parker could not satisfy that requirement. Even so, the Federal Motor Carrier Safety Administration, or 'FMCSA,' is authorized to issue variances for the federal physical and medical standards. *See* 49 U.S.C. § 31315(a)(1) (allowing for a waiver for periods of time not to exceed three months), (b)(2) (allowing for an exemption for periods of time not to exceed five years). Parker applied for a variance with the FMCSA,[6] and, after a thirty-day period for public notice and comment on her application,[7] the FMCSA granted her a two-year

---

under the federal 'Commercial Motor Vehicle Safety Act of 1986' . . . and the regulations promulgated pursuant to that law"); N.J. Admin. Code § 13:60-1.3(g) (using the federal standards for both interstate and intrastate CDLs).

[6] *See* Qualification of Drivers; Application for Exemptions; Hearing, 81 Fed. Reg. 50594, 50595 (Aug. 1, 2016).

[7] *See* Qualification of Drivers; Application for Exemptions; Hearing, 81 Fed. Reg. at 50594; *see also* 49 U.S.C. § 31315(b)(6) (setting the notice and comment procedures for exemption requests).

exemption from the hearing requirement to begin on September 6, 2016.[8]

That exemption was also subject to limitations. It was "valid for operation of a [commercial motor vehicle] only within the United States for the purpose of interstate commerce." Exemption No. H00471 (JA127). And it "prohibited" Parker "from operating a motorcoach or bus with passengers in interstate commerce." *Id.*

With that exemption and her satisfaction of the other requirements for a CDL, the New Jersey Motor Vehicle Commission, or 'NJMVC,' issued Parker an interstate CDL on June 6, 2017. Parker later began driving commercial motor vehicles for FedEx.

**B. Parker Receives Endorsements for Driving Commercial Motor Vehicles with Passengers and Does So for Eight Months.**

Parker was also interested in driving commercial motor vehicles with passengers. But to do so, New Jersey requires not only a CDL but also at least one endorsement[9] – a P endorsement.[10] An S endorsement is also needed to drive

---

[8] *See* Qualification of Drivers; Exemption Applications; Hearing, 83 Fed. Reg. 6702, 6703–04 (Feb. 14, 2018).

[9] *See generally* N.J. Stat. § 39:3-10.11 (defining 'endorsement' to mean "an authorization to a commercial driver license required to permit the holder of the license to operate certain types of commercial motor vehicles"); N.J. Admin. Code § 13:21-23.6(b) (listing five types of vehicles – double/triple trailers, passenger vehicles, tank vehicles, vehicles transporting certain types of hazardous materials, and school buses – that require endorsements to drive).

[10] *See* N.J. Stat. §§ 39:3-10.1, 39.3-10.18.

school buses.[11]  There are supplemental qualifications and requirements that CDL holders have to meet to obtain those endorsements.[12]  For instance, there are additional knowledge and skills tests for both endorsements.[13]  And, under New Jersey law, an applicant for those endorsements must satisfy the federal medical and physical-fitness standards for a CDL – regardless of whether the applicant has received a variance from the FMCSA.[14]  Unlike federal law, New Jersey does not allow applicants to seek individual exceptions to those medical or physical requirements.  Rather, New Jersey permits waivers only to "a class of persons or class of commercial motor vehicles," but only if "such waiver is not contrary to the public interest and does not diminish the safe operation of commercial motor vehicles."[15]  New Jersey did not have a waiver that

---

[11] *See* N.J. Stat. §§ 39:3-10.12, 39:3-10.18(a)(2); *see also id.* § 39:1-1 (defining 'school bus'); N.J. Admin. Code § 13:21-23.15 (2005); *id.* § 13:21-14.3 (2012).

[12] *See also* N.J. Admin. Code § 13:21-14.5(a) (requiring that applicants seeking a P endorsement also be at least 21 years old, have three years driving experience, possess a New Jersey driver's license, be physically fit and of good character, and submit to fingerprinting); *id.* § 13:21-14.3 (requiring a P endorsement for an S endorsement).

[13] *See* N.J. Stat. § 39:3-10.1.

[14] *See* N.J. Stat. § 39:3-10.1 (requiring that applicants have good "physical fitness in the form of a medical examination"); N.J. Admin. Code § 13:21-14.5(c)(11) (requiring that applicants satisfy the physical and medical requirements in 49 C.F.R. § 391.41, as amended and supplemented to receive a P endorsement); *id.* § 13:21-14.3 (extending that same requirement to drivers of school buses).

[15] N.J. Stat. § 39:3-10.29.

would enable persons with hearing impairments to drive commercial motor vehicles with passengers.[16]

Despite her inability to meet the federal hearing standard, as is required for the New Jersey P and S endorsements, in October 2017, Parker applied for and received both endorsements.

With those endorsements, Parker began working for First Transit of North Brunswick in January 2018 as a shuttle bus driver for students and faculty of Rutgers University. In July 2018, while she was employed with First Transit, the NJMVC received an inquiry about her authorization to drive commercial motor vehicles with passengers. After examining the issue and coordinating with the FMCSA, the NJMVC notified Parker in a letter dated August 9, 2018, that her federal exemption allowed her to have a CDL, but not a P or an S endorsement:

> The FMCSA variance, which exempts you from the hearing requirements specified in 49 CFR 391.41(b) (11), specifically authorizes you to operate a commercial motor vehicle (CMV) in interstate commerce and prohibits you from operating a motor coach or bus with passengers in interstate commerce. In addition, the FMCSA variance does not apply to the operation of school buses; therefore, you are prohibited from

---

[16] During the pendency of this litigation, the NJMVC promulgated a new regulation specifying the limited applicability of federal medical variances: "A waiver from the physical qualifications of 49 CFR 391.41, granted by the Federal Motor Carrier Safety Administration for interstate commerce pursuant to 49 U.S.C. § 31315, is limited to interstate commerce only." N.J. Admin. Code § 13:21-23.28(a) (2020) (amended 2023).

> operating any CMV requiring a passenger (P) and school bus (S) endorsement.

Letter from Gina M. Sine, Manager, Driver Review Bureau, to Katrina Parker (Aug. 9, 2018) (JA136). The NJMVC sent Parker a follow-up letter dated August 17, 2018, that repeated that same message. In addition, the follow-up letter informed Parker that her endorsements would be removed effective August 28, 2018, and it directed her to "visit a Motor Vehicle Agency after August 28, 2018[,] and obtain a duplicate . . . commercial driver license (CDL) without a P and S endorsement." Letter from Gina M. Sine, Manager, Driver Review Bureau, to Katrina Parker (Aug. 17, 2018) (JA158). Neither letter offered Parker an evidentiary hearing or other opportunity to be heard before the revocation of the P and S endorsements. Without the endorsements, First Transit ended Parker's employment later that month.

### C. Parker Sues in the District Court.

Under New Jersey law, Parker had 45 days to challenge the revocation of her endorsements in Superior Court.[17] But she did not do so. Instead, about seven months later, on March 25, 2019, she initiated this suit in the District Court against the NJMVC and B. Sue Fulton in her official capacity as its Chief Administrator for monetary damages as well as for declaratory and injunctive relief.[18] Parker claimed disability

---

[17] *See* N.J. R. App. Prac. 2:4-1(b). *See generally* N.J. Admin. Code § 13:19-1.2 (describing the process to request an administrative hearing after the issuance of a notice of proposed action against a driver's license).

[18] In July 2022, while this case was pending in the District Court, Latrecia Littles-Floyd became the Acting Chief Administrator of the NJMVC. *Cf.* Fed. R. Civ. P. 25(d) (providing for automatic substitution of successor officeholders for official-capacity claims); Fed. R. App. P. 43(c)(2) (same); *Vanderklok v. United States*, 868 F.3d 189,

discrimination based on her deafness under three statutes: Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and New Jersey's Law Against Discrimination, or 'LAD.' She also brought civil rights claims under the Fourteenth Amendment and 42 U.S.C. § 1983 for violations of procedural due process on the ground that she did not have a meaningful opportunity to be heard before the NJMVC revoked her endorsements. The District Court exercised federal question and civil rights jurisdiction over Parker's federal claims, *see* 28 U.S.C. §§ 1331, 1343(a), and supplemental jurisdiction over her LAD claim, *see id.* § 1367(a).

The NJMVC and the Chief Administrator filed a motion to dismiss that challenged the sufficiency of Parker's allegations for each of her claims and asserted Eleventh Amendment immunity for every claim except the § 504 claim.[19] The District Court granted that motion in part by merging her freestanding Fourteenth Amendment claim into her § 1983 claim;[20] by eliminating her claim for monetary relief under

---

205 n.16 (3d Cir. 2017) (explaining that this Court may take judicial notice of "information [that] is publicly available on government websites").

[19] *See* 42 U.S.C. § 2000d-7(a)(1) (abrogating Eleventh Amendment immunity for claims under § 504 of the Rehabilitation Act); *cf. United States v. Georgia*, 546 U.S. 151, 159 (2006) (setting forth a three-part test for evaluating whether Title II abrogates Eleventh Amendment immunity); *Geness v. Admin. Off. of Pa. Cts.*, 974 F.3d 263, 270 (3d Cir. 2020) (applying the *United States v. Georgia* three-part test); *Bowers v. Nat'l Coll. Athl. Ass'n*, 475 F.3d 524, 553–56 (3d Cir. 2007) (same).

[20] *See Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009) ("Inasmuch as § 1983 affords a remedy for infringement of one's constitutional rights, identical claims raised under the Fourteenth Amendment are redundant,

§ 1983 on Eleventh Amendment immunity grounds;[21] and by not permitting injunctive relief with respect to any claim against the NJMVC.[22] *See Parker v. Fulton*, 2020 WL 5096990, at *2 (D.N.J. Aug. 28, 2020). But the District Court otherwise denied the motion to dismiss. *See id.*

After the NJMVC and the Chief Administrator unsuccessfully moved for reconsideration, *see id.* at *1, and discovery was completed, the parties cross-moved for summary judgment. In resolving those motions, the District Court entered summary judgment against all of Parker's claims. *See Parker v. Fulton*, 2023 WL 2535328, at *8 (D.N.J. Mar. 16, 2023).[23]

Through a timely notice of appeal, Parker invoked this Court's appellate jurisdiction over that final decision. *See* 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(1)(A). She now contests the entry of summary judgment against her disability discrimination claims under Title II, § 504, and the LAD, and against her § 1983 procedural due process claim.[24]

---

rendering the outcome of the § 1983 claims dispositive of the independent constitutional claims.").

[21] *See Hans v. Louisiana*, 134 U.S. 1, 10–11 (1890) (extending Eleventh Amendment immunity principles to nondiverse parties).

[22] At the motion-to-dismiss stage, the District Court construed Parker's Fourteenth Amendment claim as also including an equal protection component that was merged into Parker's § 1983 claim.

[23] At summary judgment, the District Court determined that Parker did not actually allege an equal protection claim. *Parker*, 2023 WL 2535328, at *7 n.3.

[24] Parker also argues that the District Court erred at summary judgment by rejecting an equal protection component to her

## II. DISCUSSION

### A. Parker's Claims for Disability Discrimination

Under the *Celotex* approach to summary judgment, if challenged by the moving party at summary judgment, the non-moving party must make "a showing sufficient to establish the existence of an element essential to that party's case . . . *on which that party will bear the burden of proof at trial*." *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024) (alteration in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Here, in applying that standard, the District Court entered summary judgment against each of Parker's disability discrimination claims because it determined that she could not provide the proof required for one element of those claims: that she was qualified for the P or S endorsements. *Parker*, 2023 WL 2535328, at *4–5. *See generally A. J. T. ex rel. A. T. v. Osseo Area Schs.*, 605 U.S. 335, 345 (2025) ("The substantive provisions of both Title II and Section 504, by their plain terms, apply to 'qualified individual[s]' with disabilities." (alteration in original) (citing 29 U.S.C. § 794(a); 42 U.S.C. § 12132)); *Wojtkowiak v. N.J.*

---

§ 1983 claim. But that was not an error – at least not one affecting Parker's substantial rights, *see* Fed. R. Civ. P. 61 – because her complaint did not mention equal protection.

The District Court's Eleventh Amendment rulings, however, were not challenged on appeal. *Cf. Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) ("[T]he Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can waive the defense. Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it." (citations omitted)); *Christy v. Penn. Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995) (explaining that despite its "jurisdictional attributes" the Eleventh Amendment "should be treated as an affirmative defense" (quoting *ITSI TV Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1291 (9th Cir. 1993))).

12

*Motor Vehicle Comm'n*, 106 A.3d 519, 527 (N.J. Super. Ct. App. Div. 2015) (internal quotation marks and citation omitted) (explaining that "otherwise qualified to participate in the activity or program at issue" is an element required to state a *prima facie* case of discrimination under the LAD for the denial of the benefits of a program). Parker now contests those rulings.

### 1. *The Title II Claim*

A Title II claim is predicated upon a plaintiff being a "qualified individual with a disability." 42 U.S.C. § 12132; *see also Geness v. Admin. Off. of Pa. Cts.*, 974 F.3d 263, 273 (3d Cir. 2020); *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018). As statutorily defined, the term 'qualified individual with a disability' requires that a Title II plaintiff meet the *essential* eligibility requirements for participation in the public entity's programs or services:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the *essential* eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2) (emphasis added).

For Parker's Title II claim, one eligibility requirement for a P or an S endorsement in New Jersey is that the CDL license holder meet the minimum federal hearing standards. *See* N.J. Stat. §§ 39:3-10.18(a)(2), 39:3-10.1; N.J. Admin. Code § 13:21-14:5(a), (c)(11); *id.* § 13:21-14.3; 49 C.F.R. § 391.41(b)(11); *see also Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999) ("When Congress enacted the ADA,

13

it recognized that federal safety rules would limit application of the ADA as a matter of law."). There is no dispute that Parker cannot meet that requirement, even with the benefit of "auxiliary aids and services," the removal of barriers, or reasonable modifications to other "rules, policies, or practices." 42 U.S.C. § 12131(2).

It is, however, an open question in this Circuit whether every eligibility requirement is also an *essential* eligibility requirement for purposes of Title II. *Compare Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 160 (2d Cir. 2013) (distinguishing 'essential eligibility requirements' from "all formal legal eligibility requirements"), *with PGA Tour, Inc. v. Martin*, 532 U.S. 661, 700 (2001) (Scalia, J., dissenting) (observing in the context of a Title III claim that "[t]o say that something is 'essential' is ordinarily to say that it is necessary to the achievement of a certain object"). But Parker does not contend that there is a difference between essential eligibility requirements and all eligibility requirements, much less that if there were such a difference, that a minimum ability to hear would not be an essential eligibility requirement for a P or an S endorsement. *Cf. Mary Jo C.*, 707 F.3d at 157 ("[W]hether an eligibility requirement is essential is determined by consulting the importance of the requirement to the program in question."); *cf. also Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004) ("Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs."); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999) ("[T]he State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' . . . ." (quoting 42 U.S.C. § 12131(2))). Instead, Parker asserts that the NJMVC and its Chief Administrator discriminated against her by failing to assess her individual competencies through a variance process for the P and S endorsements. But Parker's approach skips a step – only qualified individuals with a disability may claim

14

discrimination under Title II. *See Geness*, 974 F.3d at 273; *Haberle*, 885 F.3d at 178; *see also Olmstead*, 527 U.S. at 603 (explaining a modification that fundamentally alters a state's program is not reasonable). Parker has not made the showing that she is a qualified individual with a disability, so her claim fails without further consideration of its merits or lack thereof.

As a potential workaround to making the required showing that she is a qualified individual, Parker asserts a facial challenge to New Jersey's hearing requirement for the P and S endorsements. For this contention, she relies on *New Directions Treatment Services v. City of Reading*, 490 F.3d 293 (3d Cir. 2007), a successful facial challenge under Title II to a Pennsylvania statute that restricted the location of methadone clinics unless otherwise approved by a municipal government, *id.* at 298–99, 305. Parker argues that a similar result should follow here because New Jersey's hearing requirement for the P and S endorsements facially discriminates against deaf persons. But in *New Directions*, "[t]he parties d[id] not dispute that recovering heroin addicts are presumptively 'qualified' persons under the ADA and Rehabilitation Act." *Id.* at 308. Yet here, the NJMVC and its Chief Administrator dispute that Parker is qualified for the P and S endorsements, and Parker has not shown that she is, so *New Directions* is not a solution for her.

Parker also argues that under Title II a deaf person may drive school buses unless that person is a direct threat to the safety of others. The problem for her is that both of the sources that she relies on for that proposition – an EEOC guidance document[25] and an *en banc* decision by the Fifth Circuit[26] –

---

[25] U.S. Equal Emp. Opportunity Comm'n, Guidance on Hearing Disabilities in the Workplace and the Americans with Disabilities Act (Jan. 24, 2023) [https://perma.cc/3VGN-ZLR3].

[26] *Rizzo v. Child.'s World Learning Ctrs., Inc.*, 213 F.3d 209, 211–13 (5th Cir. 2000) (en banc) (upholding a judgment in

15

concern the application of Title I of the ADA, which governs employment discrimination, not Title II of the ADA, which applies to discrimination in public programs, services, or activities. *See generally Stanley v. City of Sanford*, 145 S. Ct. 2058, 2063 (2025) ("The ADA contains five titles separately addressing employment, public entities, public accommodations, telecommunications, and miscellaneous matters."). And Title I uses the phrase 'essential functions of the employment position' to define the term 'qualified individual with a disability' for purposes of that title and allows for a direct-threat affirmative defense, while Title II uses the phrase 'essential eligibility requirements' to define the term 'qualified individual with a disability' for purposes of that title and contains no such affirmative defense. *Compare* 42 U.S.C. § 12111(8), (3) (Title I), *with id.* § 12131(2) (Title II). *See also* Jarod S. Gonzalez, *On the Edge: The ADA's Direct Threat Defense and the Objective Reasonableness Standard*, 103 Marq. L. Rev. 513, 518–21 (2019) (chronicling the history of the direct threat defense). Thus, even if Parker's sources were persuasive in the Title I context, those differences in statutory text matter. *See Stanley*, 145 S. Ct. at 2064 ("That Congress used different language in . . . two [ADA] provisions strongly suggests that it meant for them to work differently."). And because the definition of 'qualified individual with a disability' for purposes of Title II includes a provision regarding the 'essential eligibility requirements' for the program, the sources cited by Parker do not address the critical issue in this case. Therefore, they do not provide a basis for concluding that she could meet the essential eligibility requirements for a P or an S endorsement.

---

favor of a hearing-impaired teacher's aide who was reassigned from one of her duties, driving a school van, following a parent's safety complaint).

## 2. The Section 504 Claim

Parker has not provided any reason to prevent a similar analysis from dispensing with her § 504 claim. To have a claim under § 504, a plaintiff must be an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a). In construing the meaning of that phrase in the context of a hearing-impaired applicant for nursing school, the Supreme Court rejected another appellate court's interpretation that "'otherwise qualified' persons protected by § 504 include those who could meet the requirements of a particular program in every respect except as to limitations imposed by their handicap." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 400, 406 (1979) (citing *Davis v. Se. Cmty. Coll.*, 574 F.2d 1158, 1160 (4th Cir. 1978)). It did so because such an approach "would prevent an institution from taking into account any limitation resulting from the handicap, however disabling," and "assumes, in effect, that a person need not meet legitimate physical requirements in order to be 'otherwise qualified.'" *Id.* at 406; *see also id.* at 407 n.7 ("Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise qualified' for the job of driving. Clearly, such a result was not intended by Congress." (quoting 45 C.F.R. pt. 84, App. A, p. 405 (1978))). Thus, rather than interpret 'otherwise qualified' in that manner – as Parker now asks this Court to do – the Supreme Court explained that "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Id.* at 406; *accord Sullivan v. City of Pittsburgh*, 811 F.2d 171, 182 (3d Cir. 1987). And under that standard,[27] Parker is not an 'otherwise qualified individual' for purposes

---

[27] The general standard for 'otherwise qualified' is dispositive here because Parker does not invoke the technological advances exception. *See Davis*, 442 U.S. at 412 (recognizing a 'technological advances' exception to the general definition of the term 'qualified individual' in § 504); *see also Strathie v. Dep't of Transp.*, 716 F.2d 227, 228–31 (3d Cir. 1983).

of § 504 because she cannot satisfy the hearing requirement for the P and S endorsements. *See Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1148–49 (3d Cir. 1988) (rejecting a § 504 claim by a 13-year veteran police officer because he was not otherwise qualified for the position by virtue of his drug use). Accordingly, Parker's § 504 claim fails as well.

### 3. The LAD Claim

Much like the requirements for a § 504 claim, to succeed on a disability discrimination claim under the LAD, *see* N.J. Stat. § 10:5-12(f)(1), a plaintiff must demonstrate that he or she "was otherwise qualified to participate in the activity or program at issue." *Wojtkowiak*, 106 A.3d at 527 (quoting *J.T. v. Dumont Pub. Schs.*, 103 A.3d 269, 282 (N.J. Super. Ct. App. Div. 2014)). In construing the LAD's qualification requirement, New Jersey courts have looked to federal court decisions on the qualification requirements for claims under § 504 of the Rehabilitation Act and Title II of the ADA. *See Lasky v. Borough of Hightstown*, 43 A.3d 445, 451–53 (N.J. Super. Ct. App. Div. 2012) (applying Title II principles to determine whether a person was qualified in the context of a denial of a place of public accommodation LAD claim); *J.T.*, 103 A.3d at 282 ("To determine the extent of the protection afforded to disabled persons under the LAD, we must look to the analytical framework of the RA and the ADA."); *cf. Victor v. State*, 4 A.3d 126, 140 (N.J. 2010) ("We can infer, since the Legislature has never amended the LAD to afford rights to the disabled that are different from those found in Section 504 and the ADA, that the regulatory interpretation [incorporating the federal statutes' reasonable accommodation paradigm] matches the Legislature's intent."). Consistent with that approach, if Parker could not show that she was an 'otherwise qualified individual with a disability' for purposes of § 504 or that she was a 'qualified individual with a disability' for purposes of Title II, she has not shown that she is a qualified individual for purposes of the LAD. Thus, the District Court did not err in granting summary judgment on this claim as well.

18

**B. The Procedural Due Process Claim**

Parker also appeals the entry of summary judgment against her § 1983 procedural due process claim. A Fourteenth Amendment procedural due process claim consists of three elements: (i) a deprivation of life, liberty, or property; (ii) by a state actor; (iii) without due process of law. *See Reed v. Goertz*, 598 U.S. 230, 236 (2023); *Blum v. Yaretsky*, 457 U.S. 991, 1002–03 (1982) (recounting that the Fourteenth Amendment applies only to state action); *see also* U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law."). At summary judgment, based on a review of the undisputed material facts, the District Court determined that Parker, who alleged only a deprivation of a property interest, did not satisfy the first element because she did not have a property interest in the P or S endorsements. *Parker*, 2023 WL 2535328, at *6; *see generally* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986) (explaining the meaning of the terms 'material' and 'genuine'). Parker now challenges that ruling. The NJMVC and its Chief Administrator respond that Parker did not have a property interest in the endorsements, but even if she did, she received the process that she was due because a pre-deprivation hearing was not required, and hence summary judgment was properly entered against her.

The question of whether a person has a property interest in endorsements on a driver's license is novel.[28] If Parker had a

---

[28] *See generally Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (explaining that to have a property interest for purposes of a procedural due process claim related to the revocation of a state-granted right or privilege, a "unilateral expectation" is insufficient; it takes a "legitimate claim of entitlement" to the right or privilege); *see also Mackey v.*

19

property interest in the endorsements, then she would have been due some adjudicative process because the endorsements were revoked on an individual basis. *Compare Londoner v. City & County of Denver*, 210 U.S. 373, 385–86 (1908) (holding that deprivations of property interests on an individual basis merit due process protection), *with Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445–46 (1915) (holding that the constitutional right to a hearing does not apply to rulemaking which involves "general determination[s]" that impact "more than a few people"), *and Bell v. Burson*, 402 U.S. 535, 539 (1971) ("If the statute barred the issuance of licenses to all motorists who did not carry liability insurance or who did not post security, the statute would not, under our cases, violate the Fourteenth Amendment."). And while the "core" process due under the Constitution is "notice and a meaningful opportunity to be heard," *LaChance v. Erickson*, 522 U.S. 262, 266 (1998), Parker does not contest the notice that the NJMVC provided her; she claims only a denial of a meaningful opportunity to be heard based on the lack of a pre-deprivation hearing.

In many contexts, to be meaningful, an opportunity to be heard must occur before a deprivation of a protected interest. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993). But the degree of procedural protection afforded by the Due Process Clause is "flexible" and circumstance dependent. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Not every deprivation of a property interest requires a pre-deprivation hearing. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997) ("[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause."); *James Daniel Good*, 510 U.S. at 53

---

*Montrym*, 443 U.S. 1, 10 n.7 (1979) (recognizing "the Due Process Clause applies to a state's suspension or revocation of a driver's license"); *Dixon v. Love*, 431 U.S. 105, 112 (1977) (similar); *Bell v. Burson*, 402 U.S. 535, 539 (1971) (similar).

20

(tolerating exceptions to the pre-deprivation hearing rule when "some valid governmental interest is at stake that justifies postponing the hearing until after the event" (quoting *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972))); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 n.7 (1985) ("There are, of course, some situations in which a postdeprivation hearing will satisfy due process requirements."); *see also Culley v. Marshall*, 601 U.S. 377, 386 (2024) (holding that "[a]fter a State seizes and seeks civil forfeiture of personal property, due process requires a timely forfeiture hearing but does not require a separate preliminary hearing"). To determine whether there was "the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" the Supreme Court, in *Mathews v. Eldridge*, 424 U.S. 319 (1976), articulated a three-factor test that considers (i) "the private interest that will be affected by the official action"; (ii) "the risk of an erroneous deprivation . . . and the probable value, if any, of additional or substitute procedural safeguards"; and (iii) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335; *see also B.S. v. Somerset County*, 704 F.3d 250, 271 (3d Cir. 2013) (applying the *Mathews* test to evaluate whether there was the opportunity to be heard at a meaningful time and in a meaningful manner).

The Supreme Court has twice employed the *Mathews* balancing test to evaluate procedural due process challenges to the lack of a pre-deprivation hearing associated with the deprivation of a driver's license. In *Dixon v. Love*, 431 U.S. 105 (1977), the challenge involved the revocation of a driver's license for repeated moving violations without a pre-deprivation hearing under that circumstance. *Id.* at 106–11. And in *Mackey v. Montrym*, 443 U.S. 1 (1979), the challenge was to the suspension of a driver's license for 90 days for refusing to take a breathalyzer after a drunk-driving arrest, also without a pre-deprivation hearing. *Id.* at 5–6. In both cases, safety concerns motivated the license revocation or

suspension, and the Supreme Court rejected the contention that procedural due process required a pre-deprivation hearing. *See id.* at 19; *Dixon*, 431 U.S. at 115. *But cf. Bell*, 402 U.S. at 540–42 (holding, in a case decided before the formulation of the *Mathews* test, that procedural due process required an advance hearing when the justification for the deprivation of the driver's license was not grounded in safety concerns but rather in a fiscal interest in a judgment that had "no reasonable possibility of . . . being rendered"). Parker relies on the dissent in *Mackey*, to argue that she was entitled to a pre-deprivation hearing. *See Mackey*, 443 U.S. at 21 (Stewart, J., dissenting) ("When a deprivation is irreversible—as is the case with a license suspension that can at best be shortened but cannot be undone—the requirement of some kind of hearing before a final deprivation takes effect is all the more important."). And here, even supposing that Parker has a property interest in the endorsements, the *Mathews* factors also do not compel a pre-deprivation hearing for the revocation of Parker's endorsements.[29]

The first *Mathews* factor – the private interest – examines more than simply the presence of a property interest. *See Mathews*, 424 U.S. at 335, 340–43. Rather, it evaluates the strength of the asserted interest. *See Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.*, 796 F.3d 293, 309 (3d Cir. 2015). The property interest, if any, that Parker has in the endorsements is not appreciable. It is true that she received those endorsements and that they opened employment opportunities for her, including her job at First Transit. But even so, the private interest in a driver's license – not merely an endorsement on the license – "may not be so vital and essential" as other government-conferred rights and privileges. *See Dixon*, 431 U.S. at 113. And any interest that Parker may

---

[29] *See generally TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019) (explaining that appellate courts "may affirm on any basis supported by the record, even if it departs from the District Court's rationale").

have lost, however, was in the endorsements – not in the underlying CDL or even in a basic driver's license – so even with the additional employment opportunities that they make available, any interest she had in the endorsements would be comparatively less than the private interests in a basic driver's license or a CDL. *Cf. Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895–96 (1961) (explaining that the private interest in following "a chosen trade or profession" was not affected when "[a]ll that was denied . . . was the opportunity to work at one isolated and specific military installation"). Also, any interest that Parker may have had in the endorsements is weakened significantly because she could not pass the hearing test required for them. *Cf. Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 603–04 (1974) (holding that neither notice nor an opportunity for a pre-deprivation hearing was needed to sequester personal property when title to that property was "heavily encumbered"). So, without showing that she actually qualified for the endorsements, any legitimate claim of entitlement that Parker could have for them rests on her receipt of them – and that is not a particularly potent claim. For these reasons, any property interest Parker would have in the endorsements would be quite weak.

The second *Mathews* factor – risk of error – also tilts heavily against Parker. *See Mathews*, 424 U.S. at 335, 343–47. Without evidence that Parker could pass the hearing test needed for the P and S endorsements, there is no reason to believe that the NJMVC erred in concluding that Parker could not pass the test. Parker instead argues that a pre-deprivation hearing was needed to perform an individualized assessment of her ability to safely drive commercial motor vehicles with passengers. But as explained above, none of the anti-discrimination statutes that she invokes require such an assessment at any point – pre- or post-deprivation – for persons who do not meet the essential eligibility requirements or are otherwise qualified for the endorsements. *Cf. Davis*, 442 U.S. at 407. Moreover, the availability of post-deprivation remedies further minimizes risk-of-error concerns. *See Hudson v.*

23

*Palmer*, 468 U.S. 517, 532 (1984); *Parratt v. Taylor*, 451 U.S. 527, 538 (1981) ("We have, however, recognized that postdeprivation remedies made available by the State can satisfy the Due Process Clause."), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31 (1986). And here, unlike the typical revocation of a driver's license, where the only redress is restoration of the license through the administrative process,[30] Parker also had available to her and has pursued post-deprivation claims for disability discrimination, which have the potential to provide more comprehensive relief than simply the restoration of her endorsements. *See* 42 U.S.C. § 12133 (Title II); 29 U.S.C. § 794a(a)(2) (Section 504); N.J. Stat. 10:5-12.11 (LAD); *see also* 42 U.S.C. § 2000d-7(a)(1). Thus, Parker's ability to seek meaningful post-deprivation redress in court increases not only the likelihood of correcting error but also the availability of potential compensation for any error. In sum, with the risk-of-error analysis localized to the question of Parker's ability to hear and with the availability of comparatively more comprehensive relief though civil claims for disability discrimination, the second factor weighs definitively against the need for a pre-deprivation hearing.

The third *Mathews* factor – the government's interest – likewise cuts against any pre-deprivation hearing. *See Mathews*, 424 U.S. at 335, 347–49; *Honda Lease Tr. v. Malanga's Auto.*, 152 F.4th 477, 487 (3d Cir. 2025) ("[S]ituations where some valid governmental interest is at stake . . . justif[y] postponing the hearing until after the event" (alteration in original) (quoting *Fuentes*, 407 U.S. at 82)). The criteria for the endorsements reflect an important governmental interest in the public safety of commercial motor vehicles carrying passengers. *See Dixon*, 431 U.S. at 114 (recognizing

---

[30] *E.g.*, *Dixon*, 431 U.S. at 113 (observing in a case that did not involve discrimination claims that "a licensee is not made entirely whole if his suspension or revocation is later vacated").

a strong governmental interest "in [the] safety on the roads and highways, and in the prompt removal of a safety hazard"). Yet Parker could not meet one of those safety requirements for the endorsements – the minimum hearing standard. *See* N.J. Stat. § 39:3-10.1; N.J. Admin. Code § 13:21-14.5(a), (c)(11); *id.* § 13:21-14.3; 49 C.F.R. § 391.41(b)(11). With safety concerns at issue, even without any specific consideration of the additional fiscal and administrative burdens associated with a pre-deprivation hearing, the government's interest strongly favors revocation of the endorsements without a pre-deprivation hearing. *See* N.J. Stat. § 39:3-10.10 ("The purpose of this act is to reduce or prevent commercial motor vehicle accidents, fatalities, and injuries by strengthening licensing and testing standards for drivers of commercial motor vehicles[.]").

In sum, none of the *Mathews* factors counsels in favor of affording Parker a pre-deprivation hearing: any property interest that Parker may have had in the endorsements would be weak; no one identifies any risk of error, much less one that would not be subject to adequate civil redress in court; and the NJMVC has a strong interest in public safety. So, just as the Supreme Court in *Dixon* and again in *Mackey* rejected procedural due process challenges to the lack of a pre-deprivation hearing associated with the revocation of a driver's license under the *Mathews* balancing test, Parker's procedural due process claim related to the lack of a pre-revocation hearing with respect to her P and S endorsements also fails. *See Dixon*, 431 U.S. at 115; *Mackey*, 443 U.S. at 19.

### III.   CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.

25